Illinois Rockford Corporation, a Corporation, Plaintiff-Appellee, v. Leo Kulp, et al., and Western Picture Frame Company, a Corporation, Defendants-Appellants.

**Gen. No. 50,785.**

First District, Second Division.

November 3, 1967.

Joseph D. Block, of Aaron, Aaron, Schimberg & Hess, of Chicago (Richard P. Jahn, of Chattanooga, Tennessee, of counsel), for appellants.

Lee A. Freeman, of McConnell, Freeman, Curtis & McConnell, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

This action was filed for the rescission of a stock sale agreement or, in the alternative, for damages arising out of defendants' allegedly fraudulent misrepresentations which induced plaintiff, through its sole stockholder, William Leeb, to sell to defendant Western Picture Frame Company its 50% share of the capital stock of the Pullman Couch Company (hereinafter referred to as Pullman) for a grossly inadequate price. The cause was referred to a Master in Chancery (later appointed as a Special Commissioner) who, after extensive hearings, filed a report wherein he recommended a decree denying the prayer for rescission of the transaction and awarding damages to plaintiff in the amount of $112,500 as against all defendants, jointly and severally. The decree entered by the Chancellor approved the report of the Special Commissioner, adopted the findings of fact contained therein, and provided for judgment in favor of plaintiff and against all defendants in the recommended amount, including costs.

Defendants maintain on this appeal that they are not liable for fraud or deceit as a matter of law since the alleged false representations attributed to them were not statements of a present fact or of a past fact, but were merely statements of an intention to do something in the

future and, that in any event, plaintiff did not rely upon the statements in the sale of its stock; that the record fails to disclose defendants conspired in the breach of any fiduciary obligation owing to plaintiff with regard to the sale of the stock; and that the damages awarded to plaintiff are grossly excessive for the reason that plaintiff wholly failed to prove its shares of the Pullman stock to have been worth more than the amount actually received for the stock and further, that the award fails to take additional factors into consideration.

Plaintiff maintains on this appeal that defendant Leo Kulp, who owned the other 50% of the Pullman stock, owed a fiduciary obligation to plaintiff, through Leeb, and was consequently obligated to make full disclosure to Leeb of all details of his negotiations for the sale of the Pullman stock; that the other defendants knew of Kulp's fiduciary position and acted in concert with him in the breach of that fiduciary duty; and that defendants engaged in a conspiracy to defraud plaintiff through deceit and misrepresentation.

The Pullman Couch Company of Chicago, together with its subsidiaries in Mississippi and California (all three of which are involved herein,) were engaged in the manufacture of convertible sofa beds and other upholstered furniture. Pursuant to an agreement entered in September of 1957 between plaintiff and Leo Kulp as owners of 100% of the Pullman stock, which agreement related to the management of Pullman, Kulp was to be president of Pullman and primarily responsible for the design, production and manufacturing operations. William Leeb, owner of plaintiff's stock, was to be chairman of the Pullman Board, vice-president and treasurer of the companies, and was to be in charge of the sales and finances of the Pullman enterprises. The agreement further provided that Kulp would receive $60,000 for his full-time services, that Leeb would receive $40,000 for his services, that each man had the right to elect two of the

four-man board of directors, and that the parties would confer with regard to all major company policies.

In January of 1958 Leeb was hospitalized for an illness and upon recovery commenced to spend more of his time in Palm Springs, California. He continued to participate in the affairs of Pullman, keeping himself informed with respect thereto by periodical visits to Chicago, telephone communications and the regular receipt of financial reports and statements. From the inception of the company, Leeb spent little time in Chicago and Kulp, as president, managed and controlled the affairs of Pullman.

From 1958 Pullman experienced substantial operating losses. The decline in the financial condition of the companies became so serious that in the early part of 1959 the companies were unable to meet their liabilities and the possibility of an involuntary bankruptcy was imminent. Leeb came to Chicago from Palm Springs in March of 1959 and he and Kulp engaged in a series of meetings with members of the law firm of Schwartz and Cooper, specialists in matters of bankruptcy, which culminated in a decision that Pullman should file Chapter XI proceedings to effect an arrangement with creditors under the Federal Bankruptcy Act. On April 2, 1959, the Chapter XI proceedings were filed in the Federal District Court in Chicago by all three Pullman companies. Orders were entered by that court permitting the companies to continue their operations as debtors in possession under supervision of the court. On April 3rd Leeb returned to Palm Springs.

It was made clear to all parties concerned by the referee in bankruptcy and by Attorney Schwartz that unless a plan of arrangement with creditors of Pullman was promptly forthcoming the Chapter XI proceedings would be converted into straight bankruptcy proceedings involving the liquidation of all the assets and properties of Pullman. Efforts were made by all parties concerned to find persons who would be interested in Pullman and in pro-

viding funds to finance an arrangement with creditors. It appears the only interest shown in the purchase of Pullman was that of defendants Jackson and Reinhold, and by a Mr. Hertenstein who offered to purchase all the Pullman stock for $35,000.

Defendant William Ray Jackson resides in Tennessee and is engaged in the furniture manufacturing business in that area. Defendant Arthur Reinhold, a longtime business acquaintance of both Leeb and Kulp, is president of the defendant Western Picture Frame Company, a furniture manufacturing company with headquarters in Chicago.

Shortly before the filing of the Chapter XI proceedings Reinhold learned of Pullman's troubles and contacted Leeb in California, offering to purchase Leeb's interest in the companies, but Leeb turned down the offer. Subsequent to the filing of the Chapter XI proceedings, Kulp contacted Leeb in California at the suggestion of the Southwest Texbank, one of Pullman's largest creditors, and offered $25,000 for Leeb's share in Pullman, but Leeb again refused. Lester Reinwald, Leeb's personal attorney for 28 years and also the attorney for Kulp and Pullman, testified as a court's witness that Leeb contacted him in Chicago with regard to Kulp's offer and told Reinwald that he, Leeb, would sell his shares in Pullman for $35,000 on condition he received a certified check therefor immediately. Leeb, however, testified he did not offer his stock for $35,000, but that he contacted Reinwald to determine why Kulp offered him $25,000. On April 21, 1959, Reinhold and his attorney, Harold Perlman of Chicago, met with Kulp and Attorney Reinwald. The financial condition and affairs of Pullman were discussed, and Mr. Reinwald reported to Leeb by letter following the meeting that nothing had come of the conference. The testimony concerning this meeting is that Kulp was asking between $250,000 and $300,000 for his "working interest" in Pullman and that Leeb wanted $125,000 for

his stock in Pullman. Shortly after the meeting Kulp telephoned Leeb in California and advised him to stay away from Chicago because of "ugly creditor remarks," and further advised him that he was "taking care of everything." Shortly thereafter Leeb telephoned Attorney Schwartz in Chicago who advised Leeb to come to Chicago.

Defendant Jackson, having been previously advised of the Pullman situation by Reinhold, came to Chicago from Tennessee on April 23rd and spent a day with Reinhold at the Pullman plant in Chicago. On April 27th Jackson's accountant, Meyer Winer, came to Chicago to study the Pullman books and records.

In keeping with Mr. Schwartz's recommendation, Leeb returned to Chicago from Palm Springs on Thursday, April 30th; on that date Jackson also returned to Chicago from Tennessee. On April 30th or on the morning of May 1st, Leeb met with Jackson, Winer and Kulp in an office at the Pullman plant at which time Jackson stated he would be willing to pay $50,000 for all the Pullman stock. Leeb and Kulp then stepped out of the room and talked privately. Leeb asked Kulp whether he thought $50,000 was a fair price for their interest in Pullman and Kulp replied that he thought it was a fair price because he had interviewed several other prospective buyers and had gotten nowhere with them. Kulp suggested that the offer be accepted or they might wind up with no deal at all. The two men returned to the office and Leeb said to Jackson, "O. K., Mr. Jackson, it's a deal." Jackson stated that he would like to explore the possibilities of a plan of arrangement with the creditors, whose claims against Pullman at that time constituted some $1,300,000, and that he would meet with Leeb the following day. Kulp left the factory and Leeb inquired of Jackson whether Kulp was getting anything over and above the $25,000. Jackson replied, "No, Kulp is getting $25,000. He is getting exactly the amount you are getting. We don't do

464

business—we wouldn't do business behind your back. We do not do business that way." Winer confirmed these remarks.

Later that morning, Kulp and Leeb drove to the Standard Club in downtown Chicago to attend a meeting to discuss a plan for an arrangement with creditors. On the way to the club, Leeb testified, he inquired of Kulp concerning the prospective stock sale and Kulp replied, "All we could get for the stock in the Pullman Company was $50,000." Kulp testified it was possible he discussed the value of the Pullman stock with Leeb. Leeb asked whether Kulp was getting anything over and above the $25,000 and Kulp stated he was getting nothing other than the $25,000, but he was trying for a one-year employment contract with the reorganized companies and was not certain whether he would get it.

At the Standard Club were present Kulp, Leeb, Jackson, Winer, Perlman, Reinwald, Attorneys Schwartz and Cooper, and a Mr. Berz who represented Pullman in the reorganization. Schwartz spoke of the necessity of adopting a plan of reorganization immediately or facing liquidation and a discussion ensued relative to what would be required to reach a compromise with the creditors. Jackson spoke of giving the creditors ten cents on the dollar but Schwartz felt that twenty cents would secure the creditors' consent to a reorganization. At this meeting Jackson reiterated that Leeb and Kulp were to be treated equally in the purchase of the Pullman stock.

A creditors' meeting was called for that afternoon at the offices of Schwartz and Cooper. Both Leeb and Kulp went to the meeting but only Kulp attended; Leeb rested in another room. Leeb's position was represented by Attorney Schwartz to the persons attending the meeting that unless Leeb was to receive $25,000 for his stock immediately he was going back to California and "the whole deal would blow up." A compromise offer was submitted to the members of the creditor committee on

behalf of Jackson and was rejected as inadequate. The meeting broke up without an agreement having been reached.

Jackson and Kulp engaged in several meetings and telephone conversations beginning in April of 1959 and continuing through the early part of May. It does not appear that Leeb was informed of any of these meetings. The topic of discussion at the meetings appears to have been the overall situation of Pullman, as well as negotiations for the acquisition of Kulp's interest in Pullman. Kulp testified, as did several other persons, that nothing definite came of any of these meetings or negotiations; Kulp further testified that this was the reason he did not report to Leeb concerning the meetings.

On the morning of Saturday, May 2nd, Jackson and Reinhold arranged to present Leeb with a check in the amount of $25,000 for his share of the Pullman stock, but Leeb desired to consult with Attorney Reinwald before consummating the deal. Reinwald was unavailable on Saturday and made arrangements to meet with Reinhold and Attorney Perlman at Perlman's home on Sunday, May 3rd, to complete the transaction. Reinwald prepared a handwritten agreement for the sale of plaintiff's stock and explained the agreement to Leeb during the automobile ride to Perlman's home on Sunday. Reinwald further testified he told Leeb that he assumed Kulp would come to him for representation in the handling of the sale of Kulp's stock, and that if this should occur, regardless of what nature of deal Kulp might make, Reinwald would represent him as a separate matter, completely independent of and without any regard to Leeb's deal, just as Leeb was now asking Reinwald to close his deal without any relation to Kulp. Leeb made no mention of any promise by Reinhold or Jackson that Leeb and Kulp were to be treated identically in the sale of the stock. Leeb did express his awareness that Kulp would probably seek an employment contract with the reorganized Pull-

466

man companies and stated that he, Leeb, was not interested in future employment by the reorganized companies. Reinwald further testified that Leeb stated to him that the figure of $25,000 was $10,000 less than he had offered to sell his stock in April, but that he was anxious to get his money and to "forget about the whole matter." At the Perlman home the sales agreement submitted by Reinwald was revised to meet certain objections made by Perlman and plaintiff's stock was sold to the Western Picture Frame Company for the sum of $25,000.

On Monday, May 4th, Reinhold and Perlman met with Kulp and Reinwald in Perlman's office. Negotiations were had for the purchase of Kulp's share in Pullman, and it was finally agreed that Kulp would receive an option for the purchase of his stock for $25,000, a year's employment contract with the reorganized companies at a salary of $40,000, and a consultation agreement under which Kulp would receive, after the termination of his full time employment, compensation equal to 10% of the annual net profits of Pullman, if any, with a maximum limit of $225,000. At one point during the negotiations Kulp walked out of the meeting when his demand for a five-year employment contract was rejected. The agreement was finally signed by Kulp on May 7th.

The evidence shows that, after extensive negotiations, the problems concerning the burdensome leases, including the amount of rent, the size of the leasing space, equipment to be leased, the duration of the leases, and the like, were settled on or prior to June 17th, as were the matters relating to the arrangement with the Southwest Texbank which held a factor's lien on all Pullman's accounts receivable. On May 10th the arrangement with the creditors was accepted by the creditors' committee, Jackson and Reinhold offering twenty cents on the dollar to the creditors of each of the Chicago and Mississippi companies and fifty cents on the dollar to the California company

467

creditors. The arrangement was confirmed by the District Court on June 17th and 18th. On June 18th Kulp was served with notice that the option to purchase his 50% of the Pullman stock would be exercised by Jackson and Reinhold. Following these dates the evidence shows that Jackson and Reinhold invested some $600,000 in Pullman to finance the settlements and to provide working capital. The evidence further shows that Pullman continued to lose money and had a net loss for the year June 30, 1959 of over $580,000, with losses from July of 1959 to January of 1960 in an estimated amount of $250,000 to $300,000.

Pursuant to his employment contract, Kulp worked for the reorganized Pullman companies until the end of 1959. However, in September of 1959, he tendered his resignation, giving as the reason therefor differences which had occurred between him and Reinhold relating to the operation of the reorganized companies and also his desire to enter the furniture manufacturing business in Florida. Kulp was released from his contract and was paid the sum of $10,000 for the release and a further sum of $2,000 as reimbursement for expenses incurred in connection therewith. In January of 1960, Kulp contracted for the purchase of a furniture business in Florida, and Jackson and Reinhold invested $60,000 in this business in the form of a purchase of nonvoting common stock.

Plaintiff introduced evidence to show that Kulp's consultation agreement and his subsequent rescission agreement were a sham and a fraud and that they were both part of the overall conspiracy to pay Kulp substantially more for his stock than was paid to plaintiff. The consultation agreement was attacked by evidence that Kulp was considered in the furniture industry as a poor business manager; that he was considered to have been the person responsible for Pullman's financial troubles; and that Reinhold was heard to have said he would not have employed Kulp "for twenty cents a week." The rescission agreement was attacked by the alleged circumstances

surrounding its creation, namely, that it would bolster defendants' position in the instant lawsuit.

The findings of fact made by the Special Commissioner included the following:

"12. The agreement for the acquisition of Kulp's stock and his purported employment was negotiated by him with Jackson and Buddy (Reinhold) during the period beginning April 21, and carried through on April 30th, May 1st, May 2nd and May 3rd, and finalized on May 4th, was signed by Kulp on May 5th. Formal agreements were executed July 24, 1959, which carried into effect agreements signed on May 5th and May 7th.

"13. The primary consideration and objective of the deferred compensation agreement providing for 10% of the net profits up to $225,000.00, was the acquisition of Kulp's stock. Kulp refused to part with his stock until the deferred compensation arrangement was finalized.

. . . . . .

"18. Kulp's employment contract was a subterfuge —the only consideration of value to Jackson and Reinhold from Kulp was the stock they acquired from Kulp and the stock acquired from Leeb through Kulp's efforts.

. . . . . .

"20. Jackson and Buddy cooperated and planned with Kulp to effect first a purchase of Leeb's stock for $25,000.00 and then enter into an arrangement with Kulp which would give him a minimum of $25,000.00 with a possibility of an additional $225,-000.00 and one full year's salary in return for his stock.

. . . . . .

469

"22. Neither Jackson nor Buddy nor Kulp advised Leeb during the entire period of their negotiations with Kulp of the basic provisions of their arrangement with Kulp.

. . . . . .

"25. On January 25, 1960, Kulp, Jackson and Buddy executed a rescission agreement, Jackson and Buddy acting for Pullman. On the same day, Jackson and Buddy gave Kulp $60,000.00 for a purported purchase of stock in a company to be acquired by Kulp to conduct a Florida furniture operation. In addition Kulp obtained $12,000.00 for the rescission agreement.

"26. The agreement of January 25, 1960, in point of time and by content, stamps it as another in the tactic designed to conceal the true purpose of the Defendants. It was not a bonafide rescission agreement but was entered into in order to avoid the consequences of Plaintiff's successful prosecution of his law suit.

. . . . . .

"30. Defendants Jackson and Buddy designedly negotiated for the purchase of Leeb's stock separately from the purchase of Kulp's.

"31. Defendants Jackson and Buddy omitted to give Leeb material facts regarding his sale and their purchase of his stock in not apprising him of the negotiations and probabilities with respect to the purchase of Kulp's stock.

"32. Jackson represented to Leeb, and Buddy confirmed the fact, that they were treating him equally with Kulp in the acquisition of his stock. This was a misrepresentation which caused Leeb to part with the stock for the total sum of $25,000.00.

"33. Kulp designedly, with the intention to obtain far greater consideration for his stock, negotiated separately for the sale of his stock and did not apprise Leeb of any of the details with respect to such negotiations. . . . Kulp was the 'managing' party as between him and Leeb.

· · · · · ·

"35. Leeb was induced to believe that $50,000.00 was the price for 100% of the stock and that Kulp was trying to effect a bona fide employment contract, in addition thereto.

· · · · · ·

"40. The option agreement to purchase Kulp's stock for $25,000.00, an employment contract for one year at $40,000.00 and a deferred compensation arrangement in the aggregate amount of $225,000.00 payable over a period of years, payable up to 10% of net profits if earned, was negotiated by Kulp prior to May 4th without any consultation with his attorney, Lester Reinwald.

· · · · · ·

"42. [Leeb and Kulp] . . . were joint adventurers in an ad hoc enterprise—the sale of their identical stock interests in Pullman."

The findings of law made by the Special Commissioner included the following:

"3. The Plaintiff, acting through William Leeb, was a co-adventurer with Defendant Leo Kulp in the venture encompassing the activities involving the sale of 100% of the stock of the Pullman Companies in which Plaintiff and Kulp were the only two stockholders and shared their holding at 50 percentum each.

· · · · · ·

471

"5. . . . the so-called employment and deferred compensation agreement with Leo Kulp was not in fact a separate bona fide agreement for services to be performed by Kulp in behalf of the newly reorganized Pullman Companies but was in reality and in substance a device for paying to Kulp the sum of $250,000.00 or more for his fifty percentum of Pullman stock and for which Defendants Western Picture Frame Company, Jackson and Reinhold paid Plaintiff $25,000.00 for an equal amount of stock.

"6. The Plaintiff has sustained his burden of proof to establish the existence of a fiduciary relationship. . . .

. . . . . .

"10. . . . [Leeb and Kulp] were joint adventurers in the legal sense in the sale of all their stock. They were bound, therefore, to the utmost good faith in all dealings and transactions that affected the other in this venture. Since Kulp was the 'managing partner the duty rested more heavily on him.' "

The record is devoid of any competent evidence that defendants were guilty of making false and fraudulent representations to Leeb in order to induce him to cause plaintiff to part with its stock in the Pullman companies for a grossly inadequate consideration. A misrepresentation relating to something to be done in the future does not constitute such fraud in law as will give rise to the recovery of damages in an action for fraudulent misrepresentation. The fraud must be complete at the time of the transaction and consequently cannot be based upon an intention to commit a fraud in the future. May v. Larson Co., 304 Ill App 137, 26 NE2d 139. A fraudulent misrepresentation which induces a person to action must be based upon a present or a past fact and cannot rest upon a false promise to do something in the future even though accompanied by an intention not

472

to perform. Stewart-Warner Corp. v. Remco, Inc., 205 F2d 583.

■ The statements attributed by Leeb to Kulp, Jackson and Reinhold do not constitute fraudulent misrepresentations and cannot form the basis of a judgment against defendants in this action. The statement attributed to Jackson was that Kulp would not be paid more for his stock in Pullman than the $25,000 offered to Leeb for plaintiff's stock. The statement attributed to Kulp was that the most the Pullman shareholders could get for the stock was $50,000. At the time Leeb consummated the sale of plaintiff's stock to Jackson and Reinhold on May 3rd, the evidence clearly shows he was aware that Kulp had not sold his stock. He knew further that Kulp intended to receive something in addition to the $25,000 in the form of an employment contract with the reorganized Pullman companies. Any representation made by Jackson, Reinhold or Kulp as to what Kulp was to receive in the future related to matters not then completed and depended upon further negotiations, and therefore cannot form the basis of any action for fraudulent misrepresentation.

■ Plaintiff further failed to show that it, through Leeb, relied upon the representations of the defendants in this regard. Without proof of such reliance an action for fraud will fail. See Schmidt v. Landfield, 23 Ill App2d 55, 58, 161 NE2d 702. It is clear from the evidence that Leeb struck his own bargain in the sale of plaintiff's stock. Leeb testified that he came to Chicago on April 30, 1959, and that he was introduced to Jackson on the following morning. Jackson told Leeb that he was willing to pay $50,000 for all the Pullman stock and Leeb discussed the matter privately with Kulp. In response to Leeb's question, Kulp suggested the offer was a fair one and Leeb then went back to Jackson and accepted the offer. At no time did Leeb attempt to renegotiate the price, the evidence clearly showing that he wanted only

to receive his money and return to California. Leeb closed his deal just three days after arriving in Chicago from California, the delay resulting only because Attorney Reinwald was unavailable a day earlier and further because Jackson wanted to get an idea of the creditors' response to his settlement proposal.

Leeb was an experienced businessman. He was fully cognizant of the precarious financial condition of Pullman. The testimony of Attorney Schwartz, plaintiff's own witness, was to the effect that Leeb, on Saturday, wanted his money immediately or he would return to California and "let the whole deal blow up." The testimony of Leeb's personal attorney for 28 years, Lester Reinwald, was to the same effect. Attorney Reinwald further testified that Leeb asked $35,000 for his share in Pullman prior to the time he came to Chicago.

Inconsistent with plaintiff's theory that Leeb relied upon and placed great confidence in Kulp is the fact that immediately after Kulp telephoned him in California in April of 1959 relative to the purchase of plaintiff's shares in Pullman for $25,000, Leeb telephoned Attorney Reinwald in Chicago to determine what Kulp was "working on," and the further fact that he telephoned Attorney Schwartz to determine whether he should come to Chicago after Kulp had cautioned him to stay away. Leeb further testified that he was not interested in retaining an interest in the reorganized companies. Finally, Attorney Reinwald explained to Leeb that Reinwald was representing Leeb on May 3rd in a deal completely independent of whatever deal Kulp would have with Jackson and Reinhold and at no time did Leeb raise any question as to this matter. The evidence shows that Leeb was the moving party in the sale of plaintiff's stock, that he handled the transaction completely independent from Kulp's deal, and that he did not repose confidence and trust in Kulp in the sale of plaintiff's stock.

It should be noted that there exists a question as to whether defendants misrepresented any facts to Leeb with regard to the price to be paid for the Pullman stock. Both plaintiff and Kulp were to receive $25,000 for the respective shares which they held, but plaintiff was to receive its share with no conditions attached and Kulp was to receive his in the form of an option. The fact that Kulp would receive a year's employment contract if the companies were reorganized and 10% of the net profits, if any, does not necessarily mean it was intended between the defendants that Kulp was to receive more for his stock than plaintiff. Kulp had only a probability that he would receive the $25,000 and further he was required to perform services in return for the 10% of the net profits, much the same as with any other employment or consultation agreement.

The cases cited by plaintiff in support of its position that defendants' statements to Leeb constituted fraudulent representations are inapposite on their facts. With regard to Nicosia v. Riley, 13 Ill App2d 247, 141 NE2d 663, it is claimed that the statements made by the defendant therein are similar to those made by defendants herein, namely, that a purchaser in the future wished to buy adjoining parcels of real estate owned by the plaintiff and the defendant only if the purchaser could acquire both parcels whereas in fact defendant wanted the land for himself at a price lower than their actual value. However, a reading of the opinion in that case, published in abstract only, clearly reveals that the Court found defendant's misrepresentations to have been of past and existing facts, apart from the fact that the purchaser, in reality defendant's nominee and confederate, misrepresented the value of the lots. In Kenner v. Harding, 85 Ill 264, real estate was sold on the representation that a third party had offered to buy the lot at the same price, whereas no such offer had in fact been made. In Sautter

475

v. Fulmer, 258 NY 107, 179 NE 310, defendants, the majority stockholders in a corporation, informed plaintiffs, the minority stockholders, that the ultimate purchasers of the stock offered "$300 a share for all stockholders, share and share alike," inducing plaintiffs to part with their stock for that amount, whereas defendants received $1,100 per share for their stock.

██ ██ The next question which arises is whether plaintiff proved, as the Special Commissioner found, that defendants were engaged in a conspiracy to defraud the rights of plaintiff. We are of the opinion that plaintiff's evidence in this regard amounts to no more than accusation, conjecture and innuendo. A civil conspiracy must be proved by clear and convincing evidence. National Steel & Copper Plate Co. v. Angel Research, Inc., 39 Ill App2d 419, 423, 188 NE2d 500. The conspiracy may be proved by circumstantial evidence, but such evidence must exclude every reasonable inference other than the conspiracy sought to be established. Thomas v. Kowalewski, 18 Ill App2d 612, 153 NE2d 115.

From the evidence in the record, the most that can be said with regard to the transactions involving the Pullman stock is that Jackson and Reinhold dealt with Kulp and plaintiff, through Leeb, in separate, arm's-length transactions. Prior to the filing of the Chapter XI proceedings Pullman was in dire financial straits, a condition of which Leeb was fully aware. Reinhold's offer to purchase plaintiff's shares in Pullman was turned down by Leeb who thereafter came to Chicago for conferences relative to arriving at a solution to Pullman's problems. It was determined that Chapter XI proceedings would be filed in order that an arrangement with Pullman's creditors could be attempted. However, both the referee in bankruptcy and Attorney Schwartz warned all concerned, including Leeb, of the need for prompt action in effecting a plan of arrangement with the creditors or else the proceedings

would be turned into straight bankruptcy proceedings and Pullman's stockholders "washed out."

After having been advised in California by Attorney Schwartz to return to Chicago, Leeb arrived in Chicago on Thursday, April 30th, and on the very next morning met with Jackson at the Pullman plant in Chicago. At this meeting Leeb accepted Jackson's offer to purchase the stock. After the agreement was reached Leeb attended a meeting at the Standard Club in Chicago where Attorney Schwartz again warned of the imminency of a straight bankruptcy if a plan of arrangement was not adopted immediately and where Jackson stated he would purchase the Pullman stock only if a plan of arrangement was adopted.

After the luncheon meeting, all parties concerned attended a meeting with the creditors' committee in the offices of Schwartz and Cooper. Leeb did not attend the meeting and his position was represented by Attorney Schwartz to those present that unless Leeb received his $25,000 immediately he would return to California and let "the whole thing go up in smoke." Anthony Kakassy, a member of the creditors' committee, testified that Leeb stated in his presence that the only reason Leeb was in Chicago was to collect his money and that he was anxious to leave.

The following day Jackson and Reinhold telephoned Leeb and stated they were willing to close Leeb's deal that day. Leeb contacted Reinwald to handle the closing, but Reinwald insisted that the proper releases and papers be drawn up beforehand and set the closing for the following day. Prior to the closing, Reinwald stated to Leeb that Kulp's transaction and Leeb's transaction were to be handled separately. Leeb received his money the following day and returned to California.

It is clear, from the record, that Leeb understood the position of Attorney Schwartz and the referee in bankruptcy with respect to the straight bankruptcy; that he

came to Chicago to receive his money; and that he struck his own bargain for the sale of plaintiff's stock in Pullman. The foregoing evidence negates any inference that Leeb was induced to sell plaintiff's stock through any conspiracy among defendants.

The evidence further shows Kulp was dealt with separately from Leeb in the sale of his shares in Pullman. Discussions were had between Kulp, Jackson and Reinhold throughout the month of April 1959, concerning the financial condition of the Pullman Companies and the purchase of Kulp's stock. In the meeting of April 21st, the evidence shows that Kulp wanted "all sorts of things" for his "working interest," and that nothing came of the meeting. (This was reported to Leeb in a letter from Attorney Reinwald.)

With Leeb threatening to return to California, Jackson and Reinhold purchased his shares of Pullman stock on May 3rd, although they were ready, willing and able to do so a day earlier. After having committed themselves irrevocably to the Pullman undertaking in the amount of $25,000, Jackson and Reinhold turned to striking a bargain with Kulp, knowing that a plan of arrangement had not then been effected or accepted by the creditors. The agreement with Kulp was reached on Monday, May 4th, and was finalized on May 7th, prior to the time the plan of arrangement was accepted by the creditors' committee. (Although plaintiff argues that the plan was informally accepted on Saturday, May 2nd, Anthony Kakassy of the creditors' committee testified he did not learn of the proposed plan until Tuesday or Wednesday, May 5th or 6th.) Therefore, at the time the agreement with Kulp was reached Jackson and Reinhold yet faced the problem of the plan of arrangement before they would exercise the option to purchase Kulp's shares in Pullman.

It is difficult to reconcile the charge that defendants conspired to pay plaintiff less than the consideration received by Kulp with the fact that plaintiff received its

$25,000 outright, with no conditions attached. Kulp, on the other hand, received only an option for the purchase of his stock, which was subject to the approval of a satisfactory plan of arrangement with the creditors, several prior offers for which were rejected by the creditors' committee. If that failed, Kulp would receive nothing. Also facing Jackson and Reinhold were the burdensome leases which had to be renegotiated and modified, if the reorganized companies were to be successful, as well as the matter of the factor's lien held by the Southwest Texbank on all Pullman's accounts receivable. Although the plan of arrangement was adopted by the creditors' committee on May 10th, it was not confirmed by the District Court until June 17th after which Kulp's option was exercised. Furthermore, if the reorganization failed to improve the financial condition of Pullman, so also failed Kulp's employment contract with the reorganized companies as well as the consultation agreement.

Plaintiff contends that the speed with which the transactions in question were consummated clearly indicates the existence of a conspiracy. This position cannot be reconciled with the uncontroverted evidence that both the referee in bankruptcy and Attorney Schwartz, plaintiff's own witness, continuously reminded all parties concerned of the need for quick action in order to avoid the conversion of the Chapter XI proceedings into straight bankruptcy proceedings. Prompt action was of extreme importance and consequently the speed with which the transactions were completed does not indicate the existence of a preconceived plan or conspiracy to defraud plaintiff of its rights.

■ Under the circumstances we are unable to say the record supports the finding of the Special Commissioner that defendants designed to purchase plaintiff's stock at a price substantially lower than that paid to Kulp for his shares in Pullman.

Plaintiff characterizes the deferred compensation consultation agreement and the agreement to rescind that agreement and to terminate Kulp's employment with Pullman as sham agreements which fall into the pattern of the conspiracy. Plaintiff, however, fails to show in what manner this is true. On the contrary, the initial agreement between Kulp and the other defendants gave Kulp a mere possibility of receiving any consideration for his shares in Pullman. As plaintiff's own witness, Attorney Schwartz, stated, the reorganization of the Pullman companies faced serious problems in the form of creditor acceptance of a plan of arrangement, the burdensome leases, and the like. As was stated above, Jackson and Reinhold could have refused to exercise the option and Kulp would have realized nothing for his interests in Pullman. When the option was finally exercised, Kulp was to receive $40,000 for his services to Pullman for a year and was to receive 10% of Pullman's profits, if any, not exceeding $225,000, in return for his consultation services. Although plaintiff states there existed no good reason why Kulp should advise the new owners with regard to Pullman, since he was considered a poor manager in the furniture manufacturing industry, it clearly appears that Kulp, having actively managed Pullman from its inception, was thoroughly familiar with the operations, management, creditors, etc., of Pullman so as to be of benefit to Jackson and Reinhold, who were relative newcomers to the Pullman operations. Another reason given by plaintiff that the consultation agreement was a sham is the fact that Jackson and Reinhold loaned $100,000 to Pullman the day after the creditors' committee accepted the plan of arrangement, thereby unequivocally committing themselves to Pullman and negating all possibility of their refusing to exercise Kulp's option. What plaintiff overlooks in this regard is that the money was given to Pullman with a priority of indebtedness (with the consent of the creditors' committee) to

Jackson and Reinhold in the event the entire transaction failed. Jackson and Reinhold were not as "firmly committed to Pullman" as plaintiff maintains.

With regard to the rescission agreement, it is undisputed that Kulp and Reinhold were in disagreement on the methods of operating the reorganized Pullman companies. Furthermore, Kulp wished to enter the furniture manufacturing business in Florida. In return for his rescinding his employment and consultation contracts with Pullman, Kulp received $10,000 as well as $2,000 for his costs. Jackson and Reinhold also invested $60,000 in the Florida business Kulp contracted to purchase in January of 1960. The record is devoid of any evidence that defendants' act in effecting the rescission agreement was to "bolster their position in the lawsuit filed in August of 1959."

The contention is also raised that Kulp owed Leeb a fiduciary duty with respect to the sale of the Pullman stock and that Kulp breached this duty by conspiring with Jackson and Reinhold to effect a sale of plaintiff's stock for a grossly inadequate price. The existence of a fiduciary relationship involves the concept of trust and confidence between two persons. It will be found to exist in any legal relationship where special confidence is reposed on one side and domination and influence is exercised on the other. As in the case of a conspiracy, the proof of such relationship must be clear, convincing, unmistakable and unequivocal. Marnik v. Northwestern Packing Co., 335 Ill App 568, 82 NE2d 195. Although the director of a corporation owes a fiduciary duty to the stockholders of the corporation in matters concerning company policy, the same does not hold true with regard to an individual stockholder and the purchase of his individual stock in the corporation. Hooker v. Midland Steel Co., 215 Ill 444, 74 NE 445.

It is true that Kulp on occasion discussed the sale of all the Pullman stock with prospective purchasers, including

481

Jackson and Reinhold. This, however, was necessitated by the fact that no experienced businessman would purchase a one-half interest in a company on the brink of bankruptcy. While Kulp spoke in terms of all of the Pullman stock, it appears from the evidence it was understood by the prospective purchasers that Leeb would have to be dealt with individually in the purchase of his 50% share. Leeb testified that he reposed confidence in Kulp in the negotiations for the sale of the stock, but the record does not support this position. Leeb was an experienced business man. He testified that Kulp did not exercise any domination or influence over him. Leeb was informed by Attorney Reinwald that Leeb was making his own deal with Jackson and Reinhold, separate and apart from the deal being made by Kulp, and Leeb's reaction was one of unconcern.

Plaintiff maintains Leeb and Kulp were joint venturers as to Pullman and as such Kulp occupied a fiduciary capacity, in view of the contract of September 1957, wherein Leeb and Kulp agreed that they were to confer on all major company policies and also in view of the fact that they were 50-50 stockholders. The record, however, does not substantiate this claim and in fact the Special Commissioner refused to so find although plaintiff raised this contention below. On the contrary, the facts show that Pullman was run by Kulp much the same as any other corporation. The obligation that both men confer on "all major company policies" included such matters as the decision to initiate the bankruptcy proceedings; matters such as the sale of each individual's shares of stock in Pullman clearly was not a matter of company policy.

The finding of the Special Commissioner, that Leeb and Kulp were joint venturers as to the sale of their stock is not borne out by the record. The testimony of Leeb is silent as to whether he authorized Kulp to negotiate for the sale of plaintiff's shares in Pullman. Furthermore,

Kulp testified that he received no such authorization from Leeb. On the contrary, Leeb refused to sell plaintiff's stock for $25,000 when he turned down Kulp's offer in April of 1959, and it was only after he arrived in Chicago at the end of the month that he consented to the amount of $25,000. What was said above concerning the separate, arm's-length transactions disposes of this matter.

The cases cited by plaintiff in support of its position that Kulp occupied a fiduciary position with respect to Leeb and plaintiff and that Kulp breached his duty in this regard by conspiring to defraud plaintiff are inapposite on their facts from the instant case. In Calkins v. Worth, 215 Ill 78, 74 NE 81, Dunnett v. Arn, 71 F2d 912, and Agatucci v. Corradi, 327 Ill App 153, 63 NE2d 630, the respective defendants engaged in negotiations for the sale of the property owned by both themselves and plaintiffs, were assured of making the sales, and were later held accountable to the plaintiffs after the defendants received a greater share of the purchase price. Likewise in Dutton v. Barnes, 162 Minn 430, 203 NW 414, and Tilley v. Shippee, 12 Ill2d 616, 147 NE2d 347, the facts established that plaintiffs and defendants were engaged in joint ventures and consequently occupied a confidential relation with respect to each other. In the case at bar, however, the facts show that Leeb and Kulp did not occupy a confidential relationship with regard to the sale of their respective shares of stock. In Helms v. Duckworth, 249 F2d 482, defendant, aged 37 and educated, entered a stock purchase agreement with plaintiff's deceased, aged 70, with respect to the ownership of stock in a company in which plaintiff was the minority stockholder and plaintiff's deceased was the majority stockholder. Defendant was held to have taken advantage of plaintiff's deceased by imposing upon him to sign the agreement at a time when the stock was valued very low, which action was designed to benefit defendant in later years. No such situation exists in the case at bar.

In the case of Brubaker v. Gould, 34 Ill App2d 421, 180 NE2d 873, defendant told his confederate, Lahman, to "do anything to get plaintiff's stock" and Lahman knowingly signed a false affidavit in consummating the purchase of plaintiff's shares. See Lahman v. Gould, 82 Ill App2d 220, 226 NE2d 443. Majewski v. Gallina, 17 Ill2d 92, 160 NE2d 783, involves misrepresentations as to the value of plaintiff's real estate by plaintiff's personal attorney and the attorney's confederates, resulting in plaintiff's selling the real estate at a low price. In Field v. Oberwortmann, 14 Ill App2d 218, 144 NE2d 637, plaintiff was induced by his financial adviser to sell his stock below its true value. Likewise, in Abbitt v. Gregory, 201 NC 577, 160 SE 896, defendant negotiated the sale of stock on behalf of himself, the plaintiff and the other stockholders, advising all stockholders that the purchaser would pay $106 per share, whereas defendant received an additional $52.86 per share for his stock. A reading of the cases cited by plaintiff reveal they are clearly distinguishable on their facts from the instant case.

It should be noted that the damages awarded to plaintiff are excessive. In the first place, plaintiff failed to show what the value of his stock was. Secondly, the damages awarded do not reflect the fact that plaintiff received its consideration for its stock with no conditions attached, whereas Kulp received only an option for his and a possibility of receiving 10% of the reorganized Pullman's profits, if any, for which he was to perform services.

The judgment is reversed and the cause is remanded with directions to dismiss the amended complaint for want of equity, assessing all costs, including Master's fees, against plaintiff and entering judgment thereon for the defendants and against plaintiff.

Decree reversed and cause remanded with directions.

LYONS, P. J. and BRYANT, J., concur.