WALTER M. PASKAS *et al.*, Plaintiffs-Appellants, *v.* ILLINI FEDERAL SAVINGS & LOAN ASSOCIATION *et al.*, Defendants-Appellees.

Fifth District   No. 81—486

Opinion filed August 18, 1982.

Thomas J. Nold, of Belleville, for appellants.

Listeman, Bandy & Hamilton, of Belleville (John M. English, of counsel), for appellee Illini Federal Savings & Loan Association.

Victoria J. Ehret, of Belleville, for appellee Anne T. Skikas.

JUSTICE JONES delivered the opinion of the court:

This action was brought by plaintiffs Walter Paskas (Paskas) and his wife, Agnes, to recover a sum of $14,293.60 which they allege defendant Illini Federal Savings & Loan Association (Illini) wrongfully paid out to Julian Baltakis, a joint depositor with plaintiffs in a joint savings account at Illini. Also named as defendants are the estate of Julian Baltakis and Anne Skikas, the latter of whom was named as a joint tenant with Baltakis in a new account opened with the funds in question. A counterclaim was filed by Illini pursuant to section 26.2 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 26.2) in which it tendered the disputed sum to the court and disclaimed any interest in the funds except as to usual bank charges and attorney fees. The trial court found that defendant Anne Skikas was entitled to the proceeds of the joint account with Baltakis and ordered that plaintiffs take nothing from the suit. The court further found against Illini on its counterclaim. Plaintiffs appeal and Illini cross-appeals from this judgment. We affirm.

On September 8, 1970, plaintiff Paskas opened a savings account with Illini with a deposit of $20. This account was changed to a joint savings account on September 17, 1970, when Paskas added the name of his uncle, Julian Baltakis, as joint tenant with right of survivorship. At that time, Baltakis deposited $3,000 which was to be used to pay his burial expenses. Paskas and his uncle signed a signature card creating the joint account and received a passbook, which Paskas retained in his possession.

The passbook contained the following "information" about the account:

"1. ADDITIONS AND WITHDRAWALS—*** *Passbook must be presented for withdrawal.*

        ***

3. LOSS OR DESTRUCTION OF PASSBOOK—Please notify us without delay if this book is lost, stolen, or destroyed. *A new book will be issued after an affidavit is executed by all the owners* of the account." (Emphasis added.)

The signature card stated in pertinent part: "A specimen of our signatures appears above and you are hereby authorized to act without further inquiry in accordance with writings bearing any one of such signatures. If only one signature is required, the Association may pay without liability for such payment to any one or to the survivors at any time."

The parties subsequently made three substantial deposits into the account: $2,100 from a joint checking account of Paskas and his wife, $9,496.14 from a savings account in the name of Julian Baltakis and his sister (Paskas' mother), and $2,135.35 from the sale of property jointly held by Paskas and his uncle. Various amounts were withdrawn and used to pay taxes on and maintain family rental property, to build a fence around Paskas' sister's house when his uncle went to live there, and to buy a hearing aid for the uncle.

Paskas testified that during this time there was never any discussion as to who put money into the account. "It was a family affair. Whoever wanted it put it in." Paskas, however, maintained exclusive possession of the passbook and handled all transactions regarding the account. Paskas' social security number was on the account, and he received all statements of interest earnings and reported this income on his individual tax returns. On March 26, 1976, Paskas had his wife's name added to the account.

In a letter dated March 29, 1976, Julian Baltakis, through his attorney, requested that Paskas surrender the passbook to him for purposes of making changes in the account. Baltakis cited as reasons for

his request that (1) the account did not carry his social security number and he (Baltakis) did not receive any of the records pertaining to earnings; (2) he did not authorize certain recent withdrawals from the account; and (3) he did not authorize the inclusion of Paskas' wife on the account. In April 1976, Baltakis withdrew the funds from the joint account by means of an indemnification agreement signed by himself. The agreement stated that "said account represents savings of the undersigned *** [and] WALTER M. PASKAS and AGNES D. PASKAS have not contributed any part whatsoever toward said proceeds[;]. *** the names of WALTER M. PASKAS and AGNES D. PASKAS were placed on said account for convenience purposes only *** [and] the undersigned desires to withdraw said account and make other arrangements with regard thereto, and does not have the passbook pertaining thereto." The $14,293.63 which was then in the account was placed in a second joint savings account with Baltakis' niece (Paskas' sister), Anne Skikas. Baltakis died in March 1978 and Anne Skikas claimed the proceeds of the account by reason of her status as surviving joint tenant. Paskas testified that he first became aware of the withdrawal in January 1977 when he received from Illini and Internal Revenue Service Form #1099 which indicated that the account balance was "0."

On appeal from the judgment for defendant Skikas, plaintiffs contend that the trial court erred in finding that Illini breached no conditions precedent in allowing Baltakis to withdraw funds from the joint account without presenting the passbook. They further contend that Illini misrepresented to Paskas its policy concerning withdrawals without a passbook and that Illini failed in its fiduciary duty to advise Paskas whether the signature card or the terminology appearing in the back of the passbook controlled withdrawals from the account. Finally, plaintiffs assert that defendant Skikas should not be allowed to benefit from the wrongful acts of her uncle and that the court should thus impose a trust in their favor on the proceeds of the account.

■■ ■ It is well established in Illinois that an agreement creating a joint account governs the rights of the parties thereto (*Speasl v. National Bank* (1962), 37 Ill. App. 2d 384, 186 N.E.2d 84; *In re Estate of Gubala* (1967), 81 Ill. App. 2d 378, 225 N.E.2d 646; *In re Estate of Macak* (1973), 14 Ill. App. 3d 261, 302 N.E.2d 436), and such an agreement will not be limited by internal rules of the bank which have been printed in the passbook. (*Speasl v. National Bank.*) Plaintiffs contend that presentation of the passbook was a condition precedent to withdrawal from the account and that Illini thus breached its contractual duties by paying funds to Baltakis in the absence of the

passbook. Illini's payment, however, was consistent with the parties' agreement as contained in the signature card wherein Illini was authorized to pay out funds from the account "in accordance with writings bearing any one of [the depositors'] signatures." This situation is virtually identical to that addressed in *Speasl v. National Bank*, where the court stated:

> "[T]he joint depositors saw fit to enter into an express agreement with defendants [bank] under which the latter was authorized to pay the deposit to either plaintiff or her mother. The permission or authority thus granted was not limited so as to be effective only when the passbook was presented by one of the depositors. Whatever the rules and regulations of defendant may have provided with reference to production of the passbook when a depositor withdrew money, it did not deprive the parties of the right to expressly agree as to the conditions under which their joint deposit might be paid out by the defendant. Such right was exercised by the joint depositors and the defendant bank." 37 Ill. App. 2d 384, 389, 186 N.E.2d 86, 87.

In this case, as in *Speasl v. National Bank*, the signature card agreement was within the purview of section 2(a) of "An Act to revise the law in relation to joint rights and obligations" (Ill. Rev. Stat. 1979, ch. 76, par. 2(a)), which states:

> "When a deposit in any bank or trust company transacting business in this State has been made or shall hereafter be made in the names of two or more persons payable to them when the account is opened or thereafter, such deposit or any part thereof or any interest or dividend thereon may be paid to any one of said persons whether the other or others be living or not, and when an agreement permitting such payment is signed by all said persons at the time the account is opened or thereafter the receipt or acquittance of the person so paid shall be valid and sufficient discharge from all parties to the bank for any payments so made; ***."

Further, section 4—10(a) of the Illinois Savings and Loan Act (Ill. Rev. Stat. 1979, ch. 32, par. 770(a)) provides:

> "If two or more persons opening or holding a withdrawal capital account shall execute a written agreement with the association or federal association providing that the account shall be payable to any or the survivor of them, the account, and any balance thereof which exists from time to time, shall be held by them as joint owners with right of survivorship and, unless oth-

erwise agreed, any payment by the association or federal association to any of such persons shall be a complete discharge of the association's or federal association's obligation as to the amount so paid."

Under these statutes, then, Illini properly discharged its obligation towards plaintiffs when it paid the amount of the disputed withdrawal according to the terms of the parties' agreement. The parties' rights and obligations under the contract were not limited by internal bank procedures concerning presentation of the passbook. We therefore find that Illini incurred no contractual liability in paying funds from the account in the absence of a passbook.

Plaintiffs contend, however, that Illini owed them a fiduciary duty which it breached by failing to explain the conflicting terminology concerning withdrawals found in the signature card and the passbook. Plaintiffs assert that Illini's failure to advise them that the signature card took precedence over statements contained in the passbook was tantamount to a false representation and thus constituted constructive fraud.

■■ ■ Constructive fraud is defined as a breach of legal or equitable duty which, irrespective of the moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others. (*In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 378 N.E.2d 1345.) Constructive fraud will be found in a breach of duty arising out of a fiduciary or confidential relationship. (19 Ill. L. & Prac. *Fraud* sec. 5 (1956).) Such a fiduciary relationship may be presumed from the very relationship of the parties, such as in the case of attorney and client or trustee and beneficiary, or may be found to exist in a particular situation where confidence is reposed on one side and there is a resulting superiority and influence on the other side. *Higgins v. Chicago Title & Trust Co.* (1924), 312 Ill. 11, 143 N.E. 482; 15 Chi.-Kent Rev. 328 (1937); see *Illinois Rockford Corp. v. Kulp* (1967), 88 Ill. App. 2d 458, 232 N.E.2d 190, *rev'd on other grounds* (1968), 41 Ill. 2d 215, 242 N.E.2d 228.

■■ In the instant case, plaintiffs' count IV in which they alleged Illini's breach of fiduciary duty was stricken by the trial court as being insufficient in law and thus was not considered by the court in reaching its decision. While plaintiffs do not cite the dismissal of this count as error but merely argue the merits of the issue on appeal, we find no error in the trial court's ruling. Plaintiffs present no authority, nor are we aware of any, which would indicate that, in Illinois, a fiduciary relation exists as a matter of law between a bank and its depositor. (But *cf. Stewart v. Phoenix National Bank* (1937), 49 Ariz. 34, 64

P.2d 101, where the Arizona Supreme Court held that the relationship between a bank and a customer whom it advises on financial matters comes within the category of relations legally presumed to be fiduciary. See also 15 Chi.-Kent Rev. 328 (1937).) Rather, a debtor-creditor relationship exists between the depositor and the bank and the contract between the two controls their relationship. (*Menicocci v. Archer National Bank* (1978), 67 Ill. App. 3d 388, 385 N.E.2d 63.) While a high degree of contractual responsibility is imposed on banks in paying money chargeable against their depositors' accounts (*Menicocci v. Archer National Bank*), no fiduciary duty will be found to exist absent facts showing that the depositor was subject to domination and influence on the part of the bank (*Evra Corp. v. Swiss Bank Corp.* (N.D. Ill. 1981), 522 F. Supp. 820; *People ex rel. Barrett v. Central Republic Trust Co.* (1939), 300 Ill. App. 297, 20 N.E.2d 999).

■ Plaintiffs' complaint alleged no facts giving rise to such a fiduciary duty, nor was there any showing at trial that Illini breached any duty owing to plaintiffs. In count IV, which was dismissed by the court, plaintiffs stated only that they "reposed the greatest trust and confidence in Defendant's skill and judgment in handling the passbook savings account." There is no indication, however, that plaintiffs were subject to the domination and control of Illini. Rather, the evidence shows that Paskas was experienced in handling the financial affairs of his family and had dealt not only with Illini but with other similar financial institutions over the years. Although plaintiffs may have reposed confidence in Illini to the extent that anyone reposes trust and confidence in a commercial bank, there was no resulting superiority and influence on Illini's part so as to create a fiduciary relationship. (See *Evra Corp. v. Swiss Bank Corp.*; *People ex rel. Barrett v. Central Republic Trust Co.*) In the absence of a fiduciary relationship, Illini owed no duty to plaintiffs to explain the legal effect of its rules regarding passbooks, as knowledge of the law is equally available to all parties and a cause of action cannot be predicated upon a misapprehension or misrepresentation of the law. (*Peterson v. Yacktman* (1960), 25 Ill. App. 2d 208, 166 N.E.2d 452; *Rogan v. Illinois Trust & Savings Bank* (1900), 93 Ill. App. 39, *aff'd sub nom. Foote v. Illinois Trust & Savings Bank* (1902), 194 Ill. 600, 62 N.E. 834; 19 Ill. L. & Prac. *Fraud* sec. 7 (1956).) We thus find that the trial court correctly dismissed the count of plaintiffs' complaint alleging breach of fiduciary duty by Illini, and we accordingly affirm its decision finding no misrepresentation on Illini's part.

Plaintiffs' claim against defendant Anne Skikas is based upon the allegedly false representations made by Baltakis in making the with-

drawal from the parties' joint account. The indemnity agreement executed by Baltakis contained assertions that plaintiffs had "not contributed any part whatsoever" toward the proceeds of the account and that plaintiffs' names were placed on the account "for convenience purposes only." Plaintiffs contend that these false representations rendered Baltakis' withdrawal fraudulent and that Skikas, who was named as joint tenant in the second account established with the proceeds in question, should be estopped from benefitting from Baltakis' wrongful act.

■ We find no merit in these contentions as plaintiffs have failed to show a fraudulent intent on Baltakis' part in making the disputed withdrawal. Such intent is a necessary element of actionable fraud, as fraud implies a wrongful intent, an act calculated to deceive. (*People v. L & M Liquors, Inc.* (1976), 37 Ill. App. 3d 117, 345 N.E.2d 817; 19 Ill. L. & Prac. *Fraud* sec. 4 (1956).) Here, Baltakis was entitled to withdraw the entire proceeds of the joint tenancy account upon his written request, and any assertions concerning the source of the deposited funds were immaterial to his rights as joint tenant. (See *In re Estate of Taggert* (1973), 15 Ill. App. 3d 1079, 305 N.E.2d 301.) Thus, while plaintiffs dispute the accuracy of Baltakis' statements, this is insufficient to establish that they were made in an attempt to defraud plaintiffs of their interest in the joint account. In the absence of such fraud, Baltakis, as a withdrawing joint tenant, was not legally accountable to the other joint tenants for the funds so withdrawn, nor, after his demise, are his personal representatives or beneficiaries. *In re Estate of Taggert.*

■ In urging the court to look beyond the form of the joint bank account and exercise its equitable powers to determine ownership of the account proceeds, plaintiffs emphasize Paskas' role in the family as the "key dominant male figure." As such, Paskas handled financial transactions for his mother and uncle and managed certain property which was jointly owned by him and his uncle. According to Paskas, "[i]t was a family and I was the boss." While Paskas may feel strongly that his family status entitles him rather than his sister to the proceeds of the account in question, this is of no legal significance in determining rights which arise from the creation of a joint bank account. "[A]n instrument creating a joint account under the statutes presumably speaks the whole truth," and one seeking to go behind the terms of the agreement has the burden of establishing that its effect was not intended. (*Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 591, 202 N.E.2d 470, 472.) In the instant case, we believe the trial court correctly found that the parties' rights were

governed by the agreements between them, and we accordingly affirm its judgment for defendant Skikas.

■ Turning finally to Illini's cross-appeal for attorney fees, we note that Illini made no prayer for such relief at trial nor did it present any evidence concerning this claim. Rather, Illini's pleading was merely a counterclaim for interpleader under section 26.2 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 26.2), whereby Illini requested permission to pay the disputed sum into the court and sought to be discharged from liability to the other parties in the suit. While the counterclaim contained a general request for "such other and further relief as may seem just and equitable," Illini made no allegations regarding entitlement to attorney fees either under the account agreement with plaintiffs and Baltakis or the indemnity agreement with Baltakis. It is elementary that "relief should not be granted where not pleaded [and] the pleader must stand or fall with the case made by the pleading." (*Warnes v. Champaign County Seed Co.* (1955), 5 Ill. App. 2d 151, 156, 124 N.E.2d 695, 697; *Tison & Hall Concrete Products Co. v. A.E. Asher, Inc.* (1967), 86 Ill. App. 2d 34, 229 N.E.2d 137.) Where there was no prayer for attorney fees by Illini and no evidence presented at trial on this claim, there was no basis upon which such relief could be granted. The trial court therefore did not err in failing to award Illini court costs and attorney fees incurred in defending this suit.

Affirmed.

KARNS, P. J., and WELCH, J., concur.