**Jacob and Barbara BACHMEIER, et al., Plaintiffs,**

**v.**

**BANK OF RAVENSWOOD and Felix Bachmeier, Defendants.**

**No. 86 C 4433.**

United States District Court, N.D. Illinois, E.D.

Jan. 12, 1987.

John A. Dienner, III, Chicago, Ill., for plaintiffs.

Joseph G. Bisceglia, David Bieber, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiffs bring this action pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. They also allege pendent state law claims for negligence and negligent misrepresentation, conversion, and breach of fiduciary duty and implied covenants of good faith and fair dealing. Defendant Bank of Ravenswood ("Bank") has moved to dismiss all counts. Defendant Felix Bachmeier ("Felix"), who is presently incarcerated for his complicity in the acts underlying the complaint, is not yet before the court on any pleading.[1]

---

1. Because defendant Bachmeier and eight of the ten plaintiffs share the same surname, I will refer to the individuals involved by their first names. Although the Bank asserts that Felix and the plaintiffs were closely related, there is no suggestion in any of the plaintiffs' pleadings that this is the case. Given some of the equitable considerations discussed herein, this fact

## FACTS

The complaint alleges the following facts: The Bank is a federally insured, state-chartered banking institution holding itself out to the public as a conservative investment advisor and manager of its customers' funds. During the relevant period here, approximately between 1981 and 1984, Felix was a vice-president in the Bank's trust department. He was also a director of Enico Oil Company, Inc. ("Enico"), a fly-by-night Texas oil and gas concern which is now bankrupt. ¶ 13. The complaint alleges that the Bank also had an interest in Enico. ¶¶ 70, 76–78. See text *infra* at nn. 8–9.

Acting together and in bad faith, Felix and the Bank contrived a scheme to defraud the plaintiffs, each of whom was a customer and depositor at the Bank. ¶¶ 2–7, 11, 69, 70. Although diverging somewhat among plaintiffs, the basic plot involved Felix's suggestions to the plaintiffs that they transfer their conservatively invested savings into higher yield interest accounts or certificates of deposit ("CDs") at the Bank. Once authorized to make the transfer, Felix placed the funds into another account at the Bank over which he had signatory authority. The money was then used, without informing the plaintiffs of the nature of the investment, to purchase short-term Enico notes. ¶¶ 21–62. None of the plaintiffs were ever apprised of Enico's perilous financial condition or of Felix's position or the Bank's interest in Enico. ¶¶ 12, 15.

With the exception of Monica Ternes, who was given an Enico note contemporaneously with her withdrawal of savings, ¶ 45, none of the plaintiffs received documentation of these transactions until the end of 1983. At that time, they were sent notes reflecting the investments that defendants had made for them in Enico. ¶¶ 24, 30, 38, 54, 60. Even after they received the notes, some of the plaintiffs continued to believe their investments were with the Bank or a subsidiary thereof. They claim to have first discovered the true nature of the fraud in 1984. ¶¶ 32 (Josef and Paulina), 40 (Otto and Elfrieda), 47 (Monica). Others realized that their funds were invested in Enico, but were told by Felix that their money was safe. ¶¶ 24 (Jacob and Barbara), 54 (Emanuel and Erica), 60 (Klara). Together, the plaintiffs lost approximately $123,500 as a result of defendants' plot.

### Discussion of Legal Issues

In ruling on a motion for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Dismissal is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972), quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

█ While complaints are to be liberally construed, legal conclusions or opinions couched as factual allegations are not given a presumption of truthfulness. *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). In addition, where an affirmative defense or other bar to relief is apparent from the face of the complaint, dismissal is proper. *See* 2 A *Moore's Federal Practice* ¶ 12.10. On the other hand, if there is a disputed factual issue underlying the defense, the motion must be denied. *Id.*

With these principles in mind, I turn to the Bank's arguments.

could have an impact on the case, although perhaps not in the direction the Bank might wish. *Cf. Henricksen v. Henricksen,* 640 F.2d 880, 887 (7th Cir.), *cert. denied, Smith Barney, Harris, Upham & Co. v. Henrickson,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 637 (1981) (the fact that client and broker were husband and wife "did not in any way relieve" brokerage house of its duty to supervise accounts). Because plaintiffs have not plead the fact, I assume no family relationship exists here.

## I. The Securities Fraud Claims

### A. Statute of Limitations Issues

The Bank asserts that this action is barred by the three year statute of limitations which this court must borrow from Illinois blue sky law. See *Cahill v. Ernst & Ernst*, 625 F.2d 151, 153 (7th Cir.1980). The plaintiffs concede that the three year period generally applies to § 10(b) claims brought in Illinois, but argue that the special circumstances of their case equitably toll the statute. In response, the Bank contends that the plaintiffs were "on notice" of facts which should have led them to investigate and discover the fraud within the limitations period.

In *Tomera v. Galt*, 511 F.2d 504 (7th Cir.1975), the Court of Appeals spoke to this issue. There, the Court observed that

At least two types of fraudulent behavior toll a statutory period. *Bailey v. Glover*, 21 [88 U.S.] Wall 342, 22 L.Ed. 636 (1875). In the first type, the most common, the fraud goes undiscovered even though the defendant after commission of the wrong does nothing to conceal it and the plaintiff has diligently inquired into its circumstances. The plaintiff's due diligence is essential here.... In the second type, the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed.... This type of fraudulent concealment tolls the limitations period until actual discovery by the plaintiff.

*Id.* at 510; *see also Suslick v. Rothchild Securities Corp.*, 741 F.2d 1000, 1004 (7th Cir.1984) (following *Tomera* rule). The Court held that it was the plaintiff's bur-

den to plead facts of fraudulent behavior which would toll the statute, finding the following language sufficient to plead fraudulent concealment, the second category of fraud:

[D]uring the period commencing on or about January 1, 1968 and continuing to the present, the defendants herein engaged in a continuing scheme and artifice to defraud investors, including plaintiffs, in connection with the purchase, solicitation, offer and sale of the unregistered securities....

*Id.* at 509–510.

Although plaintiffs here also plead fraudulent concealment,[2] their assertion is similar in its conclusory nature to the language disapproved of by the Court of Appeals in *Briscoe*, 663 F.2d at 723.[3] Unlike *Tomera*, where the plaintiff alleged a continuing scheme to defraud investors, here, at least with respect to some of the plaintiffs, there is no suggestion in the complaint that defendants took positive action to conceal their original misrepresentations and omissions. For these plaintiffs, due diligence becomes the dispositive issue in the statute of limitations question before the court. As the *Tomera* Court stated, "if the plaintiff bestirs himself to inquire, he has ample time to investigate and bring his action. If both parties rest on their oars, the statute runs its regular course." *Tomera*, 511 F.2d at 510, quoting *Smith v. Blachley*, 198 Pa. 173, 47 A. 985 (1901).

Plaintiffs correctly note that due diligence and the reasonableness of efforts expended to discover fraud are generally inappropriate issues for resolution on a motion to dismiss. But as I noted above, where the facts plead in the complaint are

---

**2.** Paragraph 20 of the complaint states:
The defendants fraudulently concealed from the plaintffs [sic] and others their misrepresentations of material facts, omissions to state material facts, defendant Bachmeier's conflict of interest, the nature of the investment, Enico's financial condition and the speculative nature of the Enico notes.

**3.** The complaint dismissed in *Briscoe* alleged: That all defendants mentioned above and there [sic] agents, acted under color of state law and their private capacity, knowingly and wilfully, conspired together, with the mali-

cious intent and purpose of depriving convicted accused and or Negro citizen and or convicted felon and or incarcerated client of Due Process, Effective Assistance of councel [sic], and Equal Protection of the Laws and Privileges of the United States, to-wit without plaintiff's consent or knowledge.
663 F.2d at 723. With respect to the claim of conspiracy, the Court observed: "Our conclusion goes not to artlessness which, of course, may be forgiven in such *pro se* complaints, but to the lack of intimation of *any facts* underlying the claim." *Id.*

not susceptible of conflicting inferences, the court may conclude the issue as a matter of law. This principle is well illustrated by the Court of Appeals opinion in *Hupp v. Gray*, 500 F.2d 993 (7th Cir.1974). There, the plaintiff alleged that he made stock purchases as a result of misrepresentations regarding the company whose stock he bought and the defendant's claims that the stock's value would rise significantly "at an early date." Soon after purchase, the price collapsed. Although the representations on which the plaintiff sued were not actually discovered to be false until three years later, the Court of Appeals held that "even a wholly unsophisticated investor should have realized" that something was amiss when the price dropped. 500 F.2d at 996. At the least, the Court noted, "these circumstances should have aroused suspicion or curiosity on the part of plaintiff." 500 F.2d at 996–97, quoting *Morgan v. Koch*, 419 F.2d 993, 998 (7th Cir.1969). Accordingly, the Court refused to equitably toll the statute and action was held to be barred.

■ The plaintiffs' contention here that due diligence "is not an issue at all" due to the alleged existence of a fiduciary relationship between plaintiffs and defendants was also addressed by the *Hupp* court. Indeed, the Court held specifically that such a relationship was not sufficient to toll the statute:

> While the existence of a fiduciary relationship is, no doubt, one factor which a court should consider in determining whether a plaintiff has exercised due diligence, a mere allegation that such a relationship existed is alone not necessarily determinative. A court should also consider other factors, including the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendant.

*Hupp*, 500 F.2d at 997. In light of this holding, the Illinois cases cited by plaintiffs are to no avail, as federal common law determines the circumstances which will equitably toll a federally-borrowed state statute of limitations. *Tomera*, 511 F.2d at 509; *Suslick*, 741 F.2d at 1004.

With these principles in mind, I turn to the claims of the plaintiffs before the court. Their situations differ factually, so I discuss them separately.

### 1. *Jacob and Barbara Bachmeier.*

■ At some time in 1981, these plaintiffs authorized Felix and the Bank to transfer funds into a higher yield account, expecting that the funds would be invested in an interest bearing account or CD at the Bank. Complaint ¶¶ 21, 22. They did not receive any documentation evidencing the transactions. Indeed, as of late 1983, when they apparently first asked about the matter, "they had seen neither interest nor principal repayment postings reflected in their monthly statements from the Bank." *Id.* at ¶ 24. In other words, for over two years, Jacob and Barbara were completely uninformed as to the status of their savings. Absent circumstances not pleaded here, this delay in investigating the situation is legally unreasonable. The lack of documentation concerning their 1981 transactions put them on notice that something was amiss; the two year delay in following up on that fact must bar their action here.

### 2. *Josef and Paulina Bachmeier.*

■ In "early 1982," Josef and Paulina authorized a similar transfer of funds. In "late 1983," they asked Felix about the investment, as they, too, had never received documentation of the transaction or interest posted to their account. When Felix sent them an Enico note, they "believed it was investment with the Bank or a subsidiary of the Bank." *Id.* at ¶ 30. As in the case of Jacob and Barbara, it is clear that these two plaintiffs rested on their oars. Their delay of well over a year prior to mentioning the lack of documentation or posted interest bars their action as well.

### 3. *Otto and Elfrieda Bachmeier.*

I reach the same result with respect to Otto and Elfrieda. They authorized Felix to reinvest a matured CD in late 1981 or early 1982. In late 1983, "these plaintiffs told [Felix] that they had not received any certificate of deposit or other evidence" of

the transaction. *Id.* at ¶ 38. Like the other plaintiffs previously discussed, the delay here does not justify equitable tolling.

### 4. Monica Ternes.

In late 1982 and early 1983, Monica allowed defendants to withdraw $5,500 and $11,000 from her bank account for investment, at which time she received, on Bank premises, the Enico notes attached to the complaint as exhibits E and F. Despite the form of these notes, Monica "believed that these investments were with the Bank in an interest bearing account or certificate of deposit." *Id.* at ¶ 45.

I hold that that belief was unreasonable as a matter of law. Each note is entitled "ENICO OIL COMPANY, INC." and signed by the company's president. Enico, which is identified on the note as a Texas corporation located in Chicago, Illinois, is the sole issuer of the note. More significantly, the Bank's name does not appear on these documents. There is no language to suggest that these notes reflected an interest bearing or CD account. Because these facts would give notice to even the most unsophisticated investor that the notes were not backed by the Bank, Monica's claim that she did not discover her funds were invested outside the Bank until 1984 must be disregarded in determining whether the limitations period has passed. Fraud may well have occurred in connection with Monica's purchase of Enico notes sometime in the early part of 1983, but her more than three-year delay in bringing her action here precludes me from hearing the case. Absent facts alleging diligence on her part in investigating the fraud or fraudulent concealment by the defendants, her action here is barred.

### 5. Emanuel and Erica Bachmeier.

These plaintiffs endorsed two checks over to the defendants in December, 1982, for investment at the Bank. They received no certificates, notes, or documents on the transaction. According to the complaint, "at some time after the deposit of these funds with the defendants, ... Emanuel Bachmeier asked [Felix] why

he had received no papers with regard to the deposit. [Felix] stated that these plaintiffs should have gotten them but not to worry as everything was fine." *Id.* at ¶ 53. Emanuel and Erica did not learn that their funds were invested in Enico until December, 1983.

Although it presents a close case, I cannot say that Erica and Emanuel's actions were unreasonable as a matter of law. Felix's statement here, during his employment as a vice-president of the trust department, amounts to a factual allegation of fraudulent concealment. "If the wrongdoer adds to his original fraud affirmative efforts to divert or mislead or prevent discovery, then he gives to his original act a continuing character, by virtue of which he deprives it of the protection of the statute until discovery." *Tomera*, 511 F.2d at 510, quoting *Smith v. Blachley*, 198 Pa. 173, 47 A. 985 (1901). Felix's reassurances amount to just such an affirmative effort. For these plaintiffs, then, the statute was equitably tolled until December, 1983, when plaintiffs were forwarded the matured but unpaid notes. Their June 19, 1986, action was filed within the allotted three years.

### 6. Klara Sollmann.

Although the exact dates are somewhat unclear regarding this plaintiff from the complaint, Klara went to the Bank sometime in 1981 or 1982 for investment advice. Felix told her that he could put her funds into a higher interest account and "on a date or dates presently unknown," withdrew funds in excess of $33,000 from her account for investment in Enico. She received no documentation of the transaction until December, 1983, when Felix advised her that her funds were invested in Enico. He also told her that her money was secure.

This latter representation, made despite awareness that Enico was financially imperiled, constitutes an affirmative act sufficient to toll the statute under the doctrine of fraudulent concealment. It is undisputed that Klara might have brought this action in December, 1983, when she learned about the misinvestment of her funds.

Her decision not to bring suit at that time, in light of Felix's fraudulent reassurance that the investment was safe, cannot be considered unreasonable as a matter of law.

## B. Standing and Causation Issues

■ The Bank argues that the notes issued here are not "securities" as defined under the Exchange Act. This claim, that short-term notes issued by a now insolvent company are not covered by that statute, is entirely frivolous and is quickly disposed of. It has been the law in this circuit since *Sanders v. John Nuveen & Co.*, 463 F.2d 1075 (7th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), that "notes with a maturity not exceeding nine months but offered to the public as an investment" are securities under the 1934 law. *CNS Enterprises, Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354, 1359 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

Under the commercial paper/investment paper test adopted in those cases, a standard designed to exclude commercial borrowers and lenders from the protections of federal securities law, no possible construction of plaintiffs' complaint renders the instruments at issue here outside the scope of the Act. *See, Banowitz v. State Exchange Bank*, 600 F.Supp. 1466, 1470–72 (N.D.Ill.1985) (Rovner, J., discussing application of term "securities" law to similar short-term notes). The Bank's argument that the fixed rates of interest and the short terms of the notes here indicated a commercial loan was explicitly rejected by *Hunssinger v. Rockford Business Credits, Inc.*, 745 F.2d 484 (7th Cir.1984), a case cited by the defendants' brief in another context. The Bank's suggestion that the Enico notes were issued to too small a group of people to consider the paper securities is simply unsupported.

The Bank raises two related issues, one of which deserves more extended comment. In the first, the Bank argues that because

the facts stated in the complaint show that the plaintiffs never consented to the purchase of Enico notes, they lack standing to bring their action under federal securities law.[4] Def.Mem. at 7; Def.Reply Mem. at 4–5. In the second, it claims that this lack of consent necessarily negates any causal connection between the fraudulent acts and the purchase of the notes. As the Bank puts it, "if plaintiffs were unaware of this investment until after it had taken place, they could not possibly have relied on any representation of defendants." Def.Supp. Brief at 4. Central to these arguments is the premise that "a purchase or a sale under Section 10(b) must be an intentional act." Def.Supp. Brief at 4. The plaintiffs reply that "it is difficult to conceive a more flagrant misrepresentation in the sale of securities than to tell an investor that he will receive a federally insured certificate of deposit for his money but then put those funds into an insolvent company in which the investment advisor is an undisclosed director." Pl.Mem. at 9.

Section 10(b) makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ... to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. Rule 10b–5, which was promulgated by the Securities and Exchange Commission in 1942 to implement the Act, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

---

4. Were her action not time-barred, Monica Ternes might not fall into this category. Although she claims she did not realize she was investing outside of the Bank, she was given the Enico notes at the time of the relevant transactions. Her direct purchase of securities would distinguish her case from the plaintiffs discussed above.

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Although this language is extremely broad, the Supreme Court has cautioned that § 10(b) and Rule 10b–5 promulgated under it do not "bring within [their] ambit ... all breaches of fiduciary duty in connection with a securities transaction" *Santa Fe Industries v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). *See also Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) ("we are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud"). Rather, the Court has found that only deceptive practices contravening the Act's "philosophy of full disclosure" are actionable under those provisions. *Id.*, 430 U.S. at 477, 97 S.Ct. at 1303. It has also held that only actual purchasers or sellers of securities have standing to maintain an action for such deception, misrepresentation, or nondisclosure. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Where deception is present in the context of a purchase or sale, however, the Court has repeatedly stated that § 10(b) "must be read flexibly, not technically and restrictively," to effectuate its remedial purposes. *Santa Fe*, 430 U.S. at 475–76, 97 S.Ct. at 1302. *See also Blue Chip Stamps*, 421 U.S. at 748, 95 S.Ct. at 1931 (1974), quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1470, 31 L.Ed.2d 741 (1972).

The questions raised here by the Bank turn on whether the defendants' alleged fraud was made "in connection with the purchase or sale of securities."[5] That issue, in turn, involves the two somewhat narrower inquiries noted above. The first, which goes to plaintiffs' standing to maintain their suit, considers whether an unintentional purchaser of a security is protected by the Act. The second addresses whether plaintiffs can establish reliance under § 10(b) where their purchases of securities were made unintentionally and without their consent.

These inquiries must be considered in light of the fraudulent actions alleged in the complaint. To the extent that lack of intent appears to pose a problem for plaintiffs, it is only because the fraud involved went to the very core of the transaction at issue, rather than to a particular term or condition. Such deception is akin to the kind of "switched document" fraud recently discussed by the Court of Appeals for the District of Columbia in *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1429 (D.C.Cir.1984) (Starr, J.). There, the Court observed in a footnote:

We hold that ... where no manifestation of mutual assent ever existed between the parties, no "purchase" within the meaning of the '34 Act occurred. This holding, however, does not prevent a court from finding a purchase where there was an apparent manifestation of mutual assent that was negated by a party's misrepresentation. An example of this situation would be when a person agrees to sell valuable securities of Company A contained in a paper envelope to an investor who agrees to the transaction. In our hypothetical, the envelope actually contains the worthless securities of Company B. Under [general principles of contract law], there is no contract in this hypothetical because the would-be seller's misrepresentation went to an es-

---

**5.** In view of the Supreme Court's finding in *Santa Fe Industries* that Congress intended to provide victims of deceptive securities practices with a private cause of action under § 10(b), I need not "trudge through" the four factors courts must consider before granting plaintiffs

an implied right of action under a federal statute. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 388, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

sential term. Thus, the investor's apparent assent is not effective. Even though there is no contract, a court might well find a "purchase" under the meaning of the '34 Act; what allows the apparent seller to escape contractual obligation is a misrepresentation—the very evil at which the Act is aimed.

735 F.2d at 1429, n. 14. With this discussion in mind, I turn to the standing and reliance questions posed by the Bank.

1. *Standing.*

There is no question, in the context of this motion to dismiss, that plaintiffs were actual purchasers of securities, as mandated by *Blue Chip Stamps*, or the victims of deceptive practices, as required by *Santa Fe Industries*, for purposes of the securities laws. The Bank however clings to its argument that intent is necessary to a "purchase" under § 10(b) by quarreling with the application of the *Northland Capital* hypothetical to this case. It observes that under the Supreme Court's opinion in *Marine Bank*, certificates of deposit (and similar federally insured and protected accounts) are not "securities" for purposes of § 10(b). The plaintiffs' attempts to invest in CDs thus were no different than an attempt to buy any other non-security. Citing to Judge Leighton's opinion in *Smith v. Chicago Corp.*, 566 F.Supp. 66 (N.D.Ill.1983), the Bank then concludes that because plaintiffs "did not make any decision relevant to the purchase of *securities* based on [defendants'] representations," the plaintiffs must lack standing. Def.Supp.Brief at 5, quoting *Smith* at 69 (emphasis added). In short, the Bank asserts that because the plaintiffs never attempted to purchase securities in "Company A," the result called for in the Court of Appeals' hypothetical is legally inapplicable.

There are several flaws in this argument. The first involves the Bank's application of the *Marine Bank* decision to the circumstances here. In that case, the plaintiffs purchased a certificate of deposit from a federally chartered bank which they then pledged to guarantee loans made by the bank to a financially troubled meat packing company. This purchase and guarantee was based on the bank's representations that the company would use the loans for working capital. When the bank applied the loans to the company's pre-existing debt and threatened to claim the pledged CD, the plaintiffs brought suit under § 10(b) in federal district court. *Marine Bank*, 455 U.S. at 552–54, 102 S.Ct. at 1221–22.

In a unanimous opinion, the Supreme Court held that a federally insured certificate of deposit is not a "security" for purposes of the antifraud provisions of the federal securities laws. 455 U.S. at 559, 102 S.Ct. at 1225. This holding was explicitly premised on the fact that federally chartered banks are "subject to the comprehensive set of regulations governing the banking industry." 455 U.S. at 558, 102 S.Ct. at 1224. The Court's ruling and rationale was summed up in two sentences:

> The definition of "security" in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires. It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws.

455 U.S. at 558–59, 102 S.Ct. at 1225.

This holding makes apparent the essential flaw in the Bank's position. The fact that purchasers of federally insured CDs are not accorded standing under the Act does not mean that aspiring purchasers of those instruments are also barred from proceeding. Indeed, the policy behind the Act suggests that the contrary should be true. Unlike the plaintiffs in *Marine Bank*, the investors here never purchased a federally insured CD and so were never protected by federal banking regulations. Under the Bank's argument, the plaintiffs here are also not protected by federal securities law. The result is to relegate plaintiffs' claims to state law. Considering that Congress, for the protection of the invest-

ing public, has comprehensively regulated both the banking and the securities industries, such a result would be anomalous. It would also be incorrect in view of Congress' fundamental purpose in enacting the Exchange Act: "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry," *Affiliated Ute Citizens*, 406 U.S. at 151, 92 S.Ct. at 1471 (internal citations omitted). *See also Santa Fe Industries*, 430 U.S. at 478, 97 S.Ct. at 1303.

Policy considerations also suggest that the Bank's attempt to equate all nonsecurities should be rejected. In the context of this case that contention defies common sense. Had the plaintiffs intended to purchase a refrigerator or a toaster and instead found themselves with worthless oil company stock, the Bank's argument might be convincing. Here, in contrast, the plaintiffs, upon the advice and recommendations of the defendants, decided to invest funds in certain financial instruments. Those funds were then purposefully placed, without the plaintiffs' knowledge or consent, in other financial instruments bearing very different rates of risk and return.

■ It is this financial context which distinguishes defendants' deception from other commercial fraud outside of the Act. Such deception clearly contravenes the Act's fundamental purpose of full disclosure; any other conclusion would allow some of the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" to escape federal regulation. *Marine Bank*, 455 U.S. at 556, 102 S.Ct. at 1223, quoting, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). Accordingly, I hold that, whatever plaintiffs' intent, defendants' deceptive use of their funds to purchase securities gives plaintiffs standing to sue under the federal securities laws.[6]

### 2. *Reliance.*

■ Unlike the standing issue discussed above, the Bank's contention that plaintiffs lack, as a matter of law, the intent necessary to establish reliance under the securities acts is entirely frivolous. The Bank's argument, in its own words, runs as follows:

> In order to establish reliance, plaintiffs must allege that they would have, and could have, acted differently in some significant way but for defendant's misrepresentations. *Susman v. Lincoln American Corp.*, 578 F.Supp. 1041, 1060 (N.D. Ill.1984). Plaintiffs' allegation that [Felix] invested their funds in Enico without their knowledge or authorization is thus fatal to their claim under the Securities Act. If plaintiffs were unaware of this investment until after it had taken place, they could not possibly have relied on any representation of the defendants.

Def.Supp. Brief at 4.

The Supreme Court has clearly held that the securities laws "provide[ ] a cause of action for any plaintiff who suffers an injury as a result of deceptive practices touching its sale or purchase of securities." *Santa Fe Industries*, 430 U.S. at 462, 476, 97 S.Ct. at 1292, 1302 (internal citations omitted). The Court has also held that where the complaint alleges a failure to disclose material facts, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens*, 406 U.S. at 153–54, 92 S.Ct. at 1472. Rather,

> [a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact

---

**6.** *Smith v. Chicago Corp.*, which is relied on by the Bank, is inapplicable to the situation here. Judge Leighton's opinion there concerned investors who, intending to buy stock, put up purchase money which was stolen by their investment advisor. Central to the court's holding that no § 10(b) claim was stated was the fact that no actual purchase or sale had taken place. Rather, the plaintiff's action was "essentially one for conversion." 566 F.Supp. at 69–70. Here, in contrast, purchases of securities were made because of the deceptive practices of the defendants.

establish the requisite element of causation in fact.

*Id.*

Here, the complaint clearly alleged that the defendants withheld material facts from plaintiffs who sought their advice in investing their savings conservatively and prudently. These material omissions included the defendants' placement of plaintiffs' funds in notes rather than federally insured accounts, the riskiness of the notes (especially given Enico's financial condition), and the defendants' interests in Enico Oil. Such facts would be considered important by even the most naive and unsophisticated investor, and the plaintiffs explicitly claim that they would not have made such investments had they been fully informed of the circumstances.

But, in fact, the plaintiffs claim that they were informed of none of this and, consequently, were swindled. The Bank's contention that plaintiffs could not have relied on any representation of defendants is simply without merit. Indeed, I cannot imagine a situation in which reliance could be more evident from the face of the complaint. Since the fraud alleged here involves "the very evil at which the Act is aimed," *Northland Capital*, 735 F.2d at 1429, n. 14, the Bank's motion to dismiss the securities fraud claims on reliance grounds is dismissed.

## II. The RICO Claims

### A. Statute of Limitations Questions.

 The Court of Appeals for the Seventh Circuit has recently held that two years is the appropriate statute of limitations period for RICO claims brought in this district. *Tellis v. U.S. Fidelity & Guaranty Co.*, 805 F.2d 741 (7th Cir.1986).[7] Application of this period to the facts alleged in the complaint unequivocally demonstrates that most of the plaintiffs' RICO claims are time barred. The complaint was filed on June 19, 1986. Each of the plaintiffs (with the exception of Monica who received her notes contemporaneously with her withdrawals) discovered that their funds were invested in Enico in December, 1983. Although some of the plaintiffs claim that they did not realize their funds were invested outside of the Bank until a year later, the receipt of the notes—which, according to the complaint, remained unpaid despite their maturity—put them on notice of facts which would lead even an unsophisticated investor to inquire into the situation. Those facts included the nature of the investment (short-term notes in a Chicago based, Texas oil company), the lack of relation between the Bank and the notes (suggested by the face of the note), and, perhaps even the financial instability of Enico (suggested by the fact that the notes were unpaid despite their maturity). Because there is no indication that any of the plaintiffs attempted to investigate the situation after receipt of the notes, their action, absent factual allegations which might toll the statute, must be considered barred.

 Klara's pleadings meet this requirement. Unlike the other plaintiffs, Klara's receipt of the notes was accompanied by Felix's assurances that her funds were secure. Reading the complaint liberally, it appears this plaintiff may be able to prove that Felix, whose authority as a Bank vice-president cannot be forgotten, explained away problems which might have led her to investigate. As I held above, such representations toll the statute and deprive the defendants of the time bar's protection.

### B. 18 U.S.C. § 1962(a) Pleading Problems.

The Bank alleges that the plaintiffs have failed to state a claim under RICO because there is no allegation in the complaint that the Bank received "income" from a pattern of racketeering and used it to acquire an interest in an enterprise affecting com-

---

**7.** In light of the Court of Appeals' holding, I need not consider plaintiffs' argument that five years is a more appropriate limitations period than two years under Illinois law. I note in passing, however, that I have considered and rejected this position previously. *See D & S Auto Parts, Inc. v. Schwartz*, No. 82–5279 (N.D. Ill. Aug. 29, 1986).

merce.[8] They point to § 1962(a) of the RICO Act, which states in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through a collection of an unlawful debt ... to use or invest, directly, or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

In analyzing the Bank's claim, I bear in mind the Court of Appeals' observation in *United States v. McNary*, 620 F.2d 621, 628 (7th Cir.1980) that "the statute contemplates situations in which racketeering monies will not be directly or immediately employed to establish or operate interstate enterprise. Thus, the statute on its face does not require immediate or even direct use of illicit income to establish a violation of its terms." To plead a violation under § 1962(a), then, allegations "of indirect investment of the proceeds of racketeering activity into an enterprise affecting interstate commerce is sufficient...." *Cf. McNary*, 620 F.2d at 629.

Here, the plaintiffs have met this burden. The fraudulently transferred funds constitute the illegal income described by the statute; Enico is clearly an "enterprise" affecting commerce under the Act, 18 U.S.C. § 1961(4); and plaintiffs explicitly allege that the Bank used these funds for investment in Enico. Complaint at ¶ 76.

The Bank's plea that the RICO claim should be dismissed because the complaint suggests that it actually lost income through the actions of its "errant employee," Felix, fails to consider that I must draw all possible factual inferences in the

plaintiffs' favor. Although the Bank's claim is a reasonable interpretation of the complaint, the facts stated also suggest that the Bank defrauded plaintiffs to invest in a company with which it was associated. Whether the Bank really associated with Enico and participated in the fraud, or was really an oblivious victim of Felix's duplicity, is the central issue here.[9] It is also a question which cannot be resolved in a motion to dismiss.

## C. 18 U.S.C. § 1962(c) Pleading Problems.

The Bank also claims that plaintiffs fail to state a claim under § 1962(c) of the Act. That provision provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The complaint, tracking this language, asserts that the Bank is "employed by or associated with Enico and/or with the association in fact enterprise [of the Bank, Enico, and Felix] and/or participated in the conduct of the affairs of Enico (the enterprise) and/or of the association in fact enterprise ... through the pattern of racketeering activity described above in violation of 18 U.S.C. Section 1962(c)." Complaint at ¶ 77.

The Bank objects that this charge is "wholly conclusory and unsupported by any specific allegation of fact." Def.Mem. at 12. It particularly complains of the complaint's failure to allege in any detail the association between itself and Enico. This observation, even if true, is not dispositive. The Court of Appeals has found a RICO complaint sufficient where the transactions at issue, the content of the allegedly fraudulent representations, and the identities of

---

**8.** Although only Klara's action survives the statute of limitations defense, I continue to refer to the "plaintiffs" because these arguments were raised by all of them.

**9.** The Bank also argues that RICO liability cannot be premised on *respondeat superior* princi-

ples. Since the plaintiffs disclaim any reliance on that doctrine, I find the issue unnecessary to address. Plaint.Mem. at 16. *Cf. Ghouth v. Conticommodity Services, Inc.,* 642 F.Supp. 1325, 1330 (N.D.Ill.1986).

those involved were adequately specified. *Haroco, Inc. v. American National Bank,* 747 F.2d 384, 405 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Because it has fair notice of the charges against it, "there would [be] little point in requiring plaintiff to expand the complaint...." *Id.,* 747 F.2d at 405.[10]

██ Even under a stricter pleading rule, however, plaintiffs would meet their burden. The complaint alleges that the defendants—both Felix and the Bank—contrived a scheme to defraud the plaintiffs which included making misrepresentations concerning Enico and hiding Felix's association with the company. Complaint at ¶¶ 11, 12. Although not specifically plead in the RICO count, plaintiffs allege elsewhere that the Bank was a "controlling person" at Enico and was not acting in good faith. ¶ 70. In light of these allegations, I cannot find that the complaint fails to state a cause of action.

**D. 18 U.S.C. § 1962(d)**

██ Among its line-by-line objections to plaintiffs' RICO count is the Bank's assertion that the complaint is defective in its pleading of conspiracy. This argument is entirely without merit. Its claim that plaintiffs have failed to allege affirmative assent to the fraud is simply wrong. The complaint clearly states that "the defendants contrived a scheme to defraud" the plaintiffs. Complaint at ¶ 11. The agreement and state of mind are set out even more clearly within the body of the RICO count itself, where the plaintiffs state:

> 78. Each of the defendants knowingly, willingly, and unlawfully did conspire, combine, confederate and agree together with each other to conduct and participate in conducting the affairs of Enico (the enterprise) and/or the association of fact enterprise consisting of the Bank, Enico, Bachmeier and others, through a

pattern of racketeering activity, in violation of 18 U.S.C. Section 1962(d).

This language, read in the context of the entire complaint, is clearly adequate to support the conspiracy claim.[11] To the extent the Bank's position is based on its assertion that §§ 1962(a) and 1962(c) were inadequately plead, it is, of course rejected in view of my disposition of those issues.

**E. Pattern Problems**

Necessary to each of plaintiffs' RICO claims is the allegation that the Bank's actions constituted a "pattern of racketeering activity." In keeping with its spirited challenge to the complaint, the Bank asserts that plaintiffs have failed to adequately plead the issue. Specifically, it contends that the complaint states "only one continuing episode." Def.Mem. at 15. I disagree.

Following the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), a great deal of time and effort has been spent by the courts in this district on the question of what constitutes a "pattern" of racketeering activity under the RICO act. *See Ghouth v. Conticommodity Services, Inc.,* 642 F.Supp. 1325, 1333–37 (N.D.Ill.1986) (discussing the contours of the definitional debate). This court has participated actively in that discussion. *Graham v. Slaughter,* 624 F.Supp. 222 (N.D.Ill.1985); *Medical Emergency Service Associates v. Foulke,* 633 F.Supp. 156 (N.D.Ill.1986); *Techreations, Inc. v. National Safety Council,* 650 F.Supp. 337 (N.D.Ill. September 12, 1986). In those cases, I held that:

> a pattern "requires more than a single transaction" or "criminal episode" but "not necessarily more than a single scheme." *Graham,* 624 F.Supp. at 225. For criminal acts to constitute separate

---

**10.** To this end, I note that the plaintiffs' alternative allegation that the enterprise, for RICO purposes, was composed of an "association in fact" between Felix, the Bank, and Enico, makes little difference here. *Cf. Haroco,* 747 F.2d at 400–401.

**11.** It is, of course, the context of the complaint as a whole which distinguishes this case from *Briscoe. See supra* note 3 and accompanying text. Here the Bank is alleged to have known of, authorized, participated in, and perhaps profited from the fraudulent schemes. *See Ghouth,* 642 F.Supp. at 1330.

"transactions" or "episodes," they must be "somewhat separated in time and place." *Id.* Mere "ministerial acts performed in the execution of a single fraudulent transaction" and not themselves "independently motivated crimes" do not create a pattern within the meaning of RICO, even though technically each may be a mail fraud violation. *Id.* Moreover, "an open-ended scheme may include a sufficient number of independent criminal episodes" to form a pattern. *Id. Techreations,* at 3390.

This approach is, admittedly, imprecise. *Techreations,* at 339; *Ghouth,* 642 F.Supp. at 1336. Indeed, Judge Moran has styled it an "I know it when I see it approach." *Papai v. Cremosnik,* 635 F.Supp. 1402, 1410 (N.D.Ill.1986). Nevertheless, it is, in my opinion, consistent with the language and history of the Act and the Supreme Court's ruling in *Sedima. See Ghouth,* 642 F.Supp. at 1335–36.

The Court of Appeals has recently adopted this view. Following the Supreme Court's suggestion in *Sedima* that a pattern requires some kind of "continuity plus relationship" between the predicate acts, the Court of Appeals held that "to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions...." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986).[12] The relevant factors in determining continuity, the Court observed, include the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *Id.*

 Applying these principles here mandates dismissal of the Bank's remain-

ing objection to the RICO count.[13] The complaint clearly alleges a series of similar, yet independently motivated crimes perpetrated on different victims over the course of several years. To this end, it is important to remember that the representations made here did not occur at one time before a single group. Rather, the fraud practiced was individually tailored to and executed upon the victims now before the court. Whether viewed as a single grand scheme or a series of criminal episodes, I hold plaintiffs have adequately alleged a pattern of racketeering activity.

### III. The State Law Claims

The Bank contends that each of the plaintiffs' four state law claims is legally insufficient. I will consider each of these claims in turn.

### A. Fraudulent and Negligent Misrepresentation.

Although captioned as a claim for negligence and negligent misrepresentation, the complaint's third count and the plaintiffs' memorandum suggest fraudulent misrepresentation is also being plead here. Specifically, the complaint alleges that the defendants held themselves out as investment advisors, knowing that their advice would influence customers' decisions. This behavior gave rise to a duty of due care which the Bank negligently or intentionally violated by aiding and abetting Felix's acts and by failing to supervise him. The Bank plays on the plaintiffs' mixing of the elements necessary to state each claim to argue for dismissal. I address the plaintiffs' explicit and implicit claims separately.

#### 1. *Fraudulent Misrepresentation*

 In *Soules v. General Motors Corp.,* 79 Ill.2d 282, 37 Ill.Dec. 597, 402

---

**12.** "Relationship implies that the predicate acts were committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct. Continuity, on the other hand, would embrace predicate acts occurring at different points in time or involving different victims." *Morgan,* 804 F.2d at 975. The Bank has not challenged the relationship among the predicate acts here.

**13.** In its motion to dismiss, the Bank raises issues which it does not address in its brief. Because it fails to offer authority or reasoning in support of these broad, one-sentence positions, I will not consider them here.

N.E.2d 599 (1980), the Illinois Supreme Court set forth the elements of a cause of action for fraudulent misrepresentation. Those elements, correctly cited to the court by plaintiffs, are: (1) a false statement of material fact, (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

Because the plaintiffs have alleged facts going to each of these elements, the complaint is sufficient to the extent it states a cause of action for fraudulent misrepresentation. Those facts have been discussed throughout this opinion and, given the Bank's failure to challenge their sufficiency, there is no reason to belabor the point.

### 2. *Negligent Misrepresentation*

■ With respect to this claim, the Bank argues that under the Illinois Supreme Court's decision in *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), "purely economic losses, like those plaintiffs allege, cannot be recovered under a tort thoery." Def.Mem. at 20. Because plaintiffs do not fall under the exceptions to the *Moorman* rule, the Bank asserts, their negligent misrepresentation claim must be struck.

At the outset, it is far from clear that the plaintiffs' misappropriated funds constitute the kind of economic losses discussed in *Moorman.* That case involved a plaintiff who brought a claim for consequential damages in tort against a manufacturer who sold it a storage tank which subsequently developed a crack. Observing that the buyer's remedy lies most appropriately under the comprehensive provisions of the Uniform Commercial Code, the court held that, in the absence of personal or physical harm to property, no recovery would lie for "economic loss" under strict liability or negligent misrepresentation theories. Quoting several law review articles on products liability issues, the court described economic loss as:

damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits— without any claim of personal injury or damage to other property ... as well as the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

61 Ill.Dec. at 450, 435 N.E.2d at 449 (citations omitted).

This test, which courts have had difficulty applying to the products cases for which it was fashioned, *see Dixie-Portland Flour Mills v. Nation Enterprises*, 613 F.Supp. 985, 988 (N.D.Ill.1985) (noting the erosion of the physical injury/economic loss distinction), is simply inappropriate to the financial services context here. To describe the plaintiffs' misappropriated funds as either an "economic loss" or a "property" loss is to toss a coin.

Rather than reach such an arbitrary result, several courts have followed Justice Simon's *Moorman* concurrence and turned to the policies underlying contract and tort. *Id.* 613 F.Supp. at 988.[14] I need not entertain that discussion here, however, because the Illinois Supreme Court has noted an exception to *Moorman* "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." *Moorman*, 61 Ill.Dec. at 455, 435 N.E.2d at 755, citing *Ronzy v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969).

The Bank raises two arguments against application of the exception here. Its first assertion, that banks are prohibited by law from recommending security purchases or investments, is easily disposed of. The basis of plaintiffs' negligent misrepresentation claim is that the Bank, which held itself out as being in the business of supplying financial advice to customers, failed to exercise due care in communicating such information to the plaintiffs despite knowledge that such information would influence their investment decisions. Complaint at ¶ 82. Although not precisely stated, the

---

**14.** My colleague, Judge Marvin Aspen, has stated that, since *Moorman*, Illinois law has shifted,

if not fully embraced, Justice Simon's analysis. *See Dixie-Portland Flour,* 613 F.Supp. at 988.

information failure complained of concerned Felix's interest in Enico and the riskiness of the investment. The "due care" refers to Felix and his actions.[15]

Assuming these facts, the Bank's invocation of its statutory duties only makes its breach of duty clearer. If the Bank actually held itself out as an investment advisor and gave advice relating to securities, its behavior may constitute negligence per se.[16] Accordingly, its ill-considered objection on this ground is dismissed.

The Bank's second argument against the application of the exception has more credibility. Citing the Illinois Appellate Court's opinion in *Black, Jackson and Simmons Ins. Brokerage, Inc. v. International Business Machines*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (1982), it reads *Ronzy* and *Moorman* to be "limited to situations involving one who in the course of his business or profession supplies information for the guidance of others in their relations with third parties." *Id.*, 64 Ill. Dec. at 732, 440 N.E.2d at 284. *See also, Knox College v. Celotex Corp.*, 117 Ill. App.3d 304, 72 Ill.Dec. 703, 706, 453 N.E.2d 8, 11 (1983). Other Illinois courts have not read into those decisions the third-party limitation stated by *Black, Jackson. See Marino v. United Bank of Illinois, N.A.*, 137 Ill.App.3d 523, 92 Ill.Dec. 204, 207, 484 N.E.2d 935, 938 (1985); *Perschall v. Raney*, 137 Ill.App.3d 978, 92 Ill.Dec. 431, 434, 484 N.E.2d 1286, 1289 (Ill.App.Ct.1985); *Lehmann v. Arnold*, 137 Ill.App.3d 412, 91 Ill.Dec. 914, 920, 484 N.E.2d 473, 479 (Ill. App.Ct.1985).

Given this split among the Illinois courts, I will not read *Moorman* more narrowly

than its language suggests. Because plaintiffs have plead facts sufficient to maintain negligent misrepresentation under this language, the Bank's motion to dismiss the claim is denied.[17]

### 3. *Negligent Supervision.*

■ The Bank's final attack on the third count of the complaint concerns its view that there is no cause of action for negligent supervision in Illinois. It argues that "plaintiff can point to no case in which a court has found a duty of negligent supervision, such as plaintiffs allege here." Def. Reply at 12. This statement is disingenuous. Perhaps the reason there are no cases on negligent supervision is that the law is much more favorable to the plaintiffs than they apparently realize.

"Under common-law principles of *respondeat superior*, a principal is liable for the deceit of its agent, if committed in the very business the agent was appointed to carry out. This is true even though the agent's specific conduct was carried out without the knowledge of the principal." *Commodity Futures Trading Commission v. Premex, Inc.*, 655 F.2d 779, 784 n. 10 (7th Cir.1981). *See also National Acceptance Co. v. Coal Producers Association, Inc.*, 604 F.2d 540, 543 (7th Cir.1979), quoting *Restatement of the Law of Agency, Second*, § 261 (1958) ("A person who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit fraud upon third persons is subject to liability to such third persons for fraud"). Since the plaintiffs have adequately plead facts entitling them to judgment on *respondeat*

---

**15.** The Bank sees the negligent misrepresentation claim as merely an aspect of the plaintiffs' broader negligent supervision claim. This is illustrated by the Bank's argument, first raised in its reply brief, that Felix's representations cannot be imputed to the Bank because he was not acting within the scope of his authority. It cites *United States v. Basic Construction Co.*, 711 F.2d 570, 573 (4th Cir.), *cert. denied*, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), but the case does not stand for the proposition the Bank cites it for. On the contrary, *Basic Construction* suggests that questions of scope of authority, actual or apparent, are to be left to the jury. The Bank's other arguments respect-

ing the negligent supervision claim are dealt with more fully below.

**16.** Because plaintiff has not alleged negligence per se, I need not consider whether the doctrine could be raised in this case.

**17.** Even under the Bank's reading, the plaintiffs might prevail, as Enico would be considered the third party with respect to whom plaintiffs sought information from the Bank. There are obvious difficulties with this solution, which I need not consider in view of my resolution of the issues above.

*superior* grounds, the Bank's objection to the negligent supervision claim is dismissed.

## IV. Breach of Fiduciary Duties.

▇▇▇ The Bank correctly points out, and plaintiffs do not contest, that in the absence of special circumstances, the relationship between a bank and its depositors does not create fiduciary obligations. *Paskas v. Illini Federal Savings & Loan,* 109 Ill. App.3d 24, 64 Ill.Dec. 642, 646–47, 440 N.E.2d 194, 198–99 (1982). Although the *Paskas* case noted that Arizona imposes fiduciary obligations on a bank respecting customers whom it advises on financial matters, *id.,* 64 Ill.Dec. at 646, 440 N.E.2d at 198, citing *Stewart v. Phoenix National Bank,* 49 Ariz. 34, 64 P.2d 101 (1937), the court held that, in Illinois, "no fiduciary duty will be found to exist absent facts showing that the depositor was subject to domination and influence on the part of the bank." *Paskas,* 64 Ill.Dec. at 647, 440 N.E.2d at 199. Because such facts have not been alleged here, *see supra* note 1, this count is dismissed.

## V. Conversion.

▇▇▇ The complaint states that defendants' "unauthorized taking of plaintiffs' funds and converting them to their own uses, constituted conversion." Complaint at ¶ 98. The Bank correctly replies that, with respect to intangible property such as the bank accounts at issue here, an action for conversion cannot be sustained as a matter of law. To this end, I have little to add to my colleague Judge Prentice Marshall's opinion in *In re Oxford Marketing,* 444 F.Supp. 399, 404 (N.D.Ill.1978) (holding seizure of a bank deposit does not state an action in conversion under Illinois Law). *See also Securities Fund Services v. American National Bank,* 542 F.Supp. 323, 328 (N.D.Ill.1982) (Leighton, J., dismissing conversion count based on improper wire transfer). The authorities cited by the plaintiffs are not to the contrary. Accordingly, the conversion count is dismissed.

## VI. Breach of Covenants of Good Faith and Fair Dealing.

▇▇▇ This claim, after incorporating facts common to all the counts, alleges in relevant part:

102. There were implied covenants of good faith and fair dealing with regard to the parties' banking relationships.

103. The defendants breach [sic] their obligations of good faith and fair dealing to the plaintiffs.

I agree with the Bank that this language is insufficient to state a claim. The "principle of performance in good faith comes into play in defining and modifying duties which grow out of specific contract terms and obligations. It is a derivative principle." *Gordon v. Matthew Bender & Co., Inc.,* 562 F.Supp. 1286, 1289 (N.D.Ill.1983). It does not create an independent cause of action. *Id.; Powers v. Delnor Hospital,* 135 Ill.App.3d 317, 90 Ill.Dec. 168, 172, 481 N.E.2d 968, 972 (1985). Plaintiffs attempt to save the count by alleging *in their brief* that "an implied contract existed between these parties whereby the plaintiffs tendered monies to the Bank in exchange for its promise to return the principal plus interest at a future time." Plaint. Mem. at 20. If that is the case, the complaint may be amended to reflect those facts. As its stands, it does not state a claim and must be dismissed.

### Conclusion

In ruling on the motion pending before the court, I have read the plaintiffs' complaint liberally. Much of the discussion above was premised on repeated suggestions in the complaint that the Bank was not an "oblivious victim of Felix's duplicity," but rather a "controlling" interest in Enico which knew of, and participated in, Felix's fraud. *See supra* text at note 9. Such allegations are extremely serious, and I believe that financial institutions have a right to be protected "from unfounded charges of wrongdoing which injure their reputations and goodwill." *McKee v. Pope Ballard Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 930 (N.D.Ill.1985) (internal citations omitted). If my generous reading of the complaint has been incorrect, the

plaintiffs and their attorneys are hereby warned that that document should be amended. *See,* generally, Fed.R.Civ.P., Rule 11.

For the reasons stated herein, the Bank's motion to dismiss counts I and II of the complaint is granted in part and denied in part. The motion to dismiss count III is denied; the motion to dismiss counts IV, V, and VI is granted.

It is so ordered.